**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

KATHY DREW KING, Regional Director
of Region 29 of the National Labor Relations
Board, for and on behalf of the NATIONAL
LABOR RELATIONS BOARD

                           Petitioner

v.

TROUTBROOK COMPANY, LLC D/B/A
BROOKLYN 181 HOSPITALITY, LLC

                           Respondent

21-CV

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(J)
OF THE NATIONAL LABOR RELATIONS ACT**

## I.      STATEMENT OF THE CASE

This proceeding is before the Court upon a petition filed by Kathy Drew King, Regional

Director for Region 29 of the National Labor Relations Board (the "Board"), pursuant to Section

10(j) of the National Labor Relations Act, as amended ("the Act"). 29 U.S.C. § 160(j). Section

10(j) of the Act provides that upon issuance of an administrative complaint charging that an

employer is engaging in an unfair labor practice, the Board may petition the district court "for

appropriate temporary relief or a restraining order." *See* 29 U.S.C. § 160(j).

Petitioner brings this petition against Troutbrook Company, LLC d/b/a Brooklyn 181

Hospitality, LC ("Respondent") for a preliminary injunction pending the final disposition of a

matter currently before the Board, based on a Complaint alleging that Respondent is engaging in

unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act. (29 U.S.C. §

1

158(a)(5)).[1] Under Section 8(a)(5) of the Act, it is an unfair labor practice for an employer to refuse to bargain in good faith about wages, hours, and other conditions of employment with the bargaining representative of its employees.[2] In the current case, Respondent is purposefully refusing to bargain in good faith with its employees' bargaining representative, New York Hotel and Motel Trades Council, AFL-CIO ("the Union").  More specifically, Respondent refuses to make proposals or bargain over any economic subjects with the Union until all noneconomic subjects are first resolved. Further, Respondent is restricting bargaining to six noneconomic subjects it has unilaterally chosen. Respondent's bargaining tactics are designed to sabotage productive bargaining and any hope of the parties reaching agreement. As Respondent continues using these tactics and refuses to bargain in good faith, injunctive relief is necessary.

## II.      LEGAL STANDARDS FOR INJUNCTIVE RELIEF

Section 10(j) of the Act[3] authorizes United States district courts to grant preliminary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress

---

[1] The more-specific violation of Section 8(a)(5) necessarily incorporates the general violation of Section 8(a)(1). Under Section 8(a)(1), it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights under Section 7 of the Act. Section 7 of the Act grants employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection…"

[2] Under Section 8(a)(5), it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees…" "Bargain collectively" is defined in Section 8(d) of the Act as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment…"

[3] Section 10(j) (29 U.S.C. § 160(j)) provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, and it could thereby render a final Board order ineffectual.[4]  Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation.[5]

To resolve a 10(j) petition, a district court in the Second Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether preliminary injunctive relief is "just and proper."[6]

### A.      The "Reasonable Cause" Standard

In determining whether there is reasonable cause to believe that the Act has been violated, the District Court may not decide the merits of the case.[7]  Rather, the court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals."[8]  The District Court should not resolve contested factual issues; the Regional Director's version of the facts "should be given the benefit of the doubt"[9] and, together with the inferences therefrom, "should be sustained if within the range

---

[4]  See *Kreisberg v. HealthBridge Management, LLC*, 732 F.3d 131, 143 (2d Cir. 2013); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975), citing S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted at I *Legislative History of the Labor Management Relations Act of 1947* 414, 433 (Government Printing Office 1985).

[5]  See, e.g., *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38.

[6]  See, e.g., *Kreisberg v. HealthBridge Management, LLC*, 732 F.3d at 141-142; *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2001); *Silverman v. J.R.L. Food Corp. d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999). See also *Mattina v. Kingsbridge Heights Rehabilitation and Care Center*, 329 Fed.Appx. 319, 321 (2d. Cir. 2009).

[7]  See *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1032-1033 (2d Cir. 1980).

[8]  *Kaynard v. Mego Corp.*, 633 F.2d at 1033, quoting *McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n. 17 (2d Cir. 1962).

[9]  *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37.

3

of rationality".[10]   The district court also should not attempt to resolve issues of credibility of witnesses.[11]

Similarly, on questions of law, the District Court "should be hospitable to the views of the [Regional Director], however novel."[12]   The Regional Director's legal position should be sustained "unless the [district] court is convinced that it is wrong."[13]

### B.    The "Just and Proper" Standard

The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should grant interim relief thereunder "in accordance with traditional equity practice, 'as conditioned by the necessities of public interest which Congress has sought to protect.'"[14]   In applying these principles, the Second Circuit has concluded that Section 10(j) relief is warranted where serious and pervasive unfair labor practices threaten to render the Board's processes "totally ineffective" by precluding a meaningful final remedy,[15] or where interim relief is the only effective means to preserve or restore the status quo as it existed before the onset of the violations,[16] or where the passage of time might

---

[10]   *Kaynard v. Mego Corp.*), 633 F.2d at 1031.

[11]   *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051-1052, n. 5. See also *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570, 1571 (7th Cir. 1996), cert. denied 519 U.S. 1055 (1997); *Fuchs v. Jet Spray Corp.*, 560 F.Supp. 1147, 1150-51 n. 2 (D.Mass. 1983), affd. per curiam 725 F.2d 664 (1st Cir. 1983).

[12]   *Kaynard v. Mego Corp.*, 633 F.2d at 1031, quoting *Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U.)*, 494 F.2d 1230, 1245 (2d Cir. 1974).

[13]   *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051. Accord: *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) ("appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed"); *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d at 365.

[14]   *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980), quoting *Seeler v. The Trading Port, Inc.*, 517 F.2d at 39-40.

[15]   *Kaynard v. Mego Corp.*, 633 F.2d at 1034, discussing *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38.

[16]   *Seeler v. The Trading Port, Inc.*, 517 F.2d at 38.

4

otherwise allow the respondent to accomplish its unlawful objective before being placed under any legal restraint.[17]

## III.   STATEMENT OF FACTS

Respondent operates a hotel in Brooklyn, New York. On September 24, 2018, Region 22[18] of the NLRB certified the Union as the bargaining representative of Respondent's employees. Respondent challenged the certification and refused to bargain with the Union. On February 11, 2019, Region 29 of the NLRB issued a complaint alleging that Respondent was violating Section 8(a)(5) of the Act by refusing to bargain with the Union. On June 3, 2019, the Board issued its decision ordering Respondent to bargain with the Union, and on February 28, 2020, the D.C. Circuit enforced the Board's decision and ordered Respondent to comply.[19]

On May 18, 2020, the parties held their first bargaining session, during which they reviewed the Union's initial contract proposal. Tr. 17, GC Ex. 2(c).[20] That first bargaining session was introductory in nature, and Respondent did not provide any counterproposals. Tr. 28.

On June 4, 2020, the parties met for a second time. Tr. 28, GC Ex. 2(e). At the start of the meeting, Respondent's counsel, Raymond Pascucci proposed ground rules, including focusing on

---

[17] *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1055; Accord: *Kreisberg v. HealthBridge Management,* LLC, 732 F.3d at 143; *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d at 368 (Section 10(j) relief "is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo"); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. 246, 255 (S.D.N.Y.), aff'd. 67 F.3d 1054 (2d Cir. 1995).

[18] The certification was issued by the NLRB's Regional Office in Newark, New Jersey.

[19] *Troutbrook Company LLC d/b/a Brooklyn 181 Hospitality v. National Labor Relations Board,* No. 19-1127 (D.C. Cir. Feb. 8, 2020)

[20] The relevant facts are derived from the testimony and evidence presented at the August 3, 2021 hearing before Administrative Law Judge Lauren Esposito. Transcript page references are cited as Tr. (page); exhibits as GC Ex. (number). At hearing, the parties stipulated to the admission of the parties' bargaining notes. The Union's notes are particularly detailed, and Respondent does not dispute their general accuracy. The bargaining notes were used in lieu of specific witness testimony to establish what occurred at the bargaining sessions.

noneconomic issues before moving onto economic issues. The Union rejected such a limitation, with its General Counsel Rich Maroko stating, "our preference is to talk about the whole thing, we don't want to limit ourselves," and later reiterating, "we're not limiting our ability to talk on any topics." While Respondent did not provide a counterproposal at the second bargaining meeting, Respondent counsel Pascucci made it clear that Respondent's future counterproposals would not be comprehensive, stating, "It will not be a whole contract, just some of the articles in your contract and we'll state our counterproposal." Maroko objected, saying: "Our position is good faith requires a complete proposal… You should give a full proposal so we can assess the entirety of it…" Pascucci defended his approach, saying: "when it's a first contract and you have 50 open issues on the table, it's a lot harder to make progress than 4 issues you can discuss and then move on. Just because you think something different, doesn't mean you're right."

After the meeting, on June 4, 2020, Pascucci emailed the Union's Assistant General Counsel Gideon Martin five proposed ground rules. GC Ex. 2(g). The second ground rule was: "The parties will focus on non-economic subjects before turning to economic subjects." Martin responded by email the next day, June 5, 2020, objecting to the proposed rule: "The Union believes that successful bargaining requires an ability to discuss any aspect at any time. We do not want to constrain the parties' capability to freely explore and discuss any items, such as specific proposals, terms or conditions, during bargaining sessions. Accordingly, the Union does not accept this ground rule."

By email dated June 10, 2020 Pascucci replied that the proposed ground rule "was not intended to preclude discussion about any and all issues at any point in time," and proposed a modified version of the rule: "The parties agree to focus primarily on non-economic subjects before turning to economic subjects, but it is understood that this general framework does not

preclude either party from raising and freely discussing any item at any point in the bargaining process." By email dated June 15, 2020, Martin noted that Respondent had not yet provided the Union with a counterproposal, despite having represented at the June 4 meeting that it would do so. Martin again rejected the Respondent's proposed bargaining ground rule, stating, "We want to be able to bargain over all such terms without artificial timeline or constraint. We do not believe you can preclude the parties from bringing up certain subjects. The Union rejects this proposed ground rule. Let us know if you are refusing to have meaningful discussions on economics until all non-economic subjects are addressed."

By email dated June 18, 2020, Pascucci made clear Respondent's intention to unilaterally limit bargaining to non-economic subjects first, despite the Union's objections, stating, "…Although the Hotel certainly cannot dictate the manner in which the Union chooses to negotiate, likewise the Union cannot dictate the manner in which the Hotel will negotiate. For your information, the Hotel intends to proceed as follows: In responding to the Union's proposals, the Hotel will focus on non-economic subjects first."

On June 25, 2020, the parties held their third bargaining session. Tr. GC Ex. 2(h). Prior to the session, Respondent sent its counterproposal for six non-economic provisions: recognition, non-discrimination, no strikes or lockouts, new employee probations, hours of work, and effective dates for the contract. GC Ex. 2(i). At bargaining, the Union again requested to negotiate with complete contract proposals, including economic subjects, but Respondent refused, with Pascucci saying: "These are non-economic proposals we think makes sense to start with maybe and we'll provide more as we move along." The parties discussed the six non-economic proposals, though no agreement was reached on any item. The Union again stated its objection to Respondent's approach, with Martin stating: "you know we don't agree with not addressing economic proposal

on wages, health, and retirement. When can we expect to receive proposals on those three: wages, health and retirement?" Pascucci reiterated Respondent's unilateral position: "Working on non-economics first, that's our plan. That's our preference, I get it's not your preference…" Martin further objected, stating the need for a full counterproposal: "I don't want to beat a dead horse, but I have a hard time without a complete proposal. We've given a complete proposal in good faith and it's difficult to evaluate a response when it doesn't respond to every term and condition. I don't know how I can possibly go back to a worker and discuss the recognition clause when they're asking about wages, are they going to have health coverage during COVID, and are they going to be able to retire with dignity. We think it makes it difficult to bargain… I renew our request for a complete proposal." Pascucci again refused, stating, "I think it's difficult to negotiate everything at once, we go subset of issues by subset and then eventually we reach an agreement." Pascucci later confirmed Respondent's plan: "Our intention is we work on these topics, then we reach a tentative agreement and then move on to the next set of proposals…"

The parties did not meet again until February 2, 2021, taking a hiatus from bargaining because of the pandemic's effects on Respondent's business and the broader hospitality industry in New York. Tr. 37 – 38. During this session, the Union again requested that Respondent provide a complete counterproposal including economic issues like healthcare and wages. Respondent again declined, with Pascucci stating, "I explained the last time, that's not how a first contract is done, the way I do it is first work through non economics, get through a half dozen and resolve and then move on to next sets, and eventually work through economics. That's why you have a proposal on 6 articles…" Martin responded: "You prefer noneconomic first, but that's not how I like to or accept doing it. I like to do a complete version, I don't think it upholds lawful requirements for bargaining otherwise…I don't think it's most productive doing piece meal this

way. I need to see how it affects this part of the CBA [i.e., collective bargaining agreement] and this part of the CBA, I don't know how to deal with not having a complete proposal. I renew my request for a complete proposal." At the end of the session, Martin reiterated his request for a complete proposal from Respondent, adding that providing a complete proposal is an obligation of bargaining. Pascucci said he would talk to his client about putting a full proposal on the table.

On February 5, 2021, Martin sent a letter to Pascucci, requesting records and information related to Respondent's operations. In the letter, he again asked Respondent for a complete counterproposal: "In preparation for our next bargaining session, I would like to reiterate the Union's position and request that the Hotel provide a complete proposal, including on all economic subjects." GC Ex. 2(k). On March 8, 2021, Martin again reiterated this request in an email to Pascucci: "I will reiterate the Union's request, yet again, that you provide a complete proposal, including economics and addressing all mandatory topics." GC Ex. 2(l).

On March 11, 2021, the parties held their fifth bargaining session. Tr. 40, GC Ex. 2(m). After spending part of the session discussing Respondent's operational status, the parties spent the rest of the session debating how to proceed. Martin said the Union was waiting for Respondent's proposal, to which Pascucci responded: "You're taking the position that we have to propose an overall contract. We've given you a counterproposal on several items. I've negotiated dozens of contracts, I've never done economics and non-economics from the beginning with first contracts. That's not our intention to bargain like that. We bargain on subsets of issues and then move onto the next subset…" Martin responded: "…this is more than a difference in style. While I'm requesting a complete proposal because it's more efficient and productive, it's also an obligation to cover all mandatory topics. This is not just a stylistic departure. The Hotel is obligated according to the NLRA to give a complete proposal and after this many meetings and emails, it's not good

faith bargaining to refuse [an] economic proposal." In response to Martin alleging Respondent was not following the law, Pascucci asked Martin to "enlighten [him] as to which Board cases say that," while admitting he himself had not researched the issue. Martin said he "[would] be happy to." The meeting ended shortly after that.

On March 30, 2021 Martin sent a letter to Pascucci summarizing the parties bargaining history to date, and again reasserting Respondent was failing to bargain in good faith by fragmenting bargaining and refusing to provide a complete proposal addressing all mandatory subjects. GC Ex. 2(n). On April 5, 2021, Pascucci responded by email, again defending Respondent's approach to bargaining, and claiming such an approach was consistent with his long-standing practice. GC Ex. 2(o). Martin responded by email that same day, again asserting Respondent's obligation to provide a complete proposal, and indicating the Union would be filing an unfair labor practice charge. GC Ex. 2(o). The Union filed the charge in Case No. 29-CA-275229 that day. GC Ex. 1(a).

On April 21, 2021, the parties met for their sixth and final bargaining session. Tr 41 – 42, GC Ex. 2(p). At the beginning of the meeting, Martin asked if Respondent was closer to providing a complete proposal, to which Pascucci responded, "No, you filed a charge. Let's see what the Board says about conforming to your approach or not." After discussing Respondent's current operations, the parties remained in disagreement over how to proceed, with the Union insisting it needed a complete proposal which Respondent would not provide. The parties agreed let the Board decide, with Pascucci saying: "We'll see what the Board's position is and go from there."

The parties have not met or bargained since the April 21 session. Tr. 42. On June 17, 2021, Region 29 issued a complaint alleging Respondent is failing to bargain in good faith in violation of Section 8(a)(5) of the Act. GC Ex. 1(d). On August 3, 2021, a hearing was held on the matter

before Administrative Law Judge Lauren Esposito. Post-hearing briefs are due September 7, 2021.

Tr. 91.

## IV.   THE EVIDENCE ESTABLISHES REASONABLE CAUSE TO BELIEVE RESPONDENT IS VIOLATING SECTION 8(a)(5) OF THE ACT

Section 8(a)(5) of the National Labor Relations Act makes it an unfair labor practice for an employer ''to refuse to bargain collectively with the representative of his employees….'' Section 8(d) provides that ''to bargain collectively is the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment…'' In *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485, 486 (1960), the Supreme Court recognized that ''[c]ollective bargaining... is not simply an occasion for purely formal meetings between management and labor while each maintains an attitude of take it or leave it; it presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract''; though ''the parties need not contract on any specific terms . . . they are bound to deal with each other with a serious attempt to resolve differences and reach a common ground.''  Similarly, in *NLRB v. Katz*, 369 U.S. 736, 747 (1962), the Supreme Court held that the parties must refrain not only from behavior ''which reflects a cast of mind against reaching agreement,'' but from behavior ''which is in effect a refusal to negotiate or which directly obstructs or inhibits the actual process of discussion.'' In short, as stated by the court of appeals in *NLRB v. General Electric Co*., 418 F.2d 736, 762 (2d Cir. 1969), cert. denied 397 U.S. 965 (1970),

> [T]he statute clearly contemplates that to the end of encouraging productive bargaining, the parties must make ''a serious attempt to resolve differences and reach a common ground'' . . . an effort inconsistent with ''a predetermined resolve not to budge from an initial position.'' . . . A pattern of conduct by which one party makes it virtually impossible for him to respond to the other — knowing that he is doing so deliberately — should be

condemned by the same rationale that prohibits ''going through the motions'' ''with a predetermined resolve not to budge from an initial position…'' [citations omitted].

Respondent has refused to bargain in good faith with the Union by employing bargaining tactics that are clearly designed to frustrate the bargaining process: first, by refusing to make proposals or bargain over economic subjects until all non-economic subjects have been resolved; and, second, by restricting even the non-economic subjects over which it will bargain. Predictably, as a result, no productive bargaining has occurred. There is no factual dispute in this case, and the law is clear – Respondent is not bargaining in good faith.

The evidence clearly demonstrates that Respondent is not bargaining in good faith, established by Respondent's steadfast refusal to make proposals or bargain over economic subjects until all non-economic subjects have been resolved.  In *N.L.R.B. v. Patent Trader, Inc.,* 415 F.2d 190, 198 (2nd Cir. 1969), the Court found that such a bargaining position to constitutes bad faith bargaining where the employer refused to submit economic proposals because its admitted policy was not to submit economic proposals until every non-economic issue was settled.  *Id.* at 198.  In upholding the Board's determination that the employer had failed to bargain in good faith, the Court noted, "by postponing or removing from the area of bargaining – to the very end of negotiations – [the] most fundamental terms and conditions of employment (wages, hours of work, overtime, severance pay, reporting pay, holidays, vacations, sick leave, welfare and pensions, etc.), [the  employer] reduced the flexibility of collective bargaining, [and] narrowed the range of possible compromises with the result of rigidly and unreasonably fragmenting the negotiations." *Id.*  The Court's decision in this case is consistent with the Board's long-standing interpretation of the law in this regard.[21]

---

[21] *See, e.g.*, *Kalthia Group Hotels, Inc. and Manas Hospitality LLC, d/b/a Holiday Inn Express Sacramento*, 366 NLRB No. 118, slip op. at 1, 18-19 (2018); *Detroit Newspapers*, 326 NLRB 700, 704 & fn. 11 (1998) (collecting cases), *revd. on other grounds sub nom. Detroit Typographical Union No. 18 v. NLRB*, 216 F.3d 109 (D.C. Cir.

Most recently, in *Sunbelt Rentals, Inc.*, 370 NLRB No. 102 (2021), the Board again held that, absent a union's consent, it is unlawful for an employer to refuse for months to bargain over economic terms until all non-economic terms have been resolved.  In *Sunbelt Rentals*, the Board held that the employer violated Section 8(a)(5) by refusing to bargain over wages during a four-month period when it was willing to discuss other subjects as that "reflected an unlawful intent to stall negotiations." *Id.*, slip op. at 3.  The Board distinguished its earlier decision in *Wyman Gordon Pennsylvania, LLC*, 368 NLRB No. 150 (2019), in which the Board found no violation even though the employer insisted on resolving non-economic terms before discussing economic ones because, unlike in *Sunbelt Rentals*, in *Wyman Gordon*:

> [1] the delay in discussing economic subjects was of shorter duration [approximately one month], [2] the parties continued to make progress on non-economic subjects in the meantime, and [3] the parties had agreed to a ground rule that they would discuss noneconomic subjects before economic subjects.  [*Id.*]

The instant case clearly falls within the *Sunbelt Rentals* line of cases rather than under *Wyman Gordon* because the parties had no agreement to negotiate non-economic terms first.  To the contrary, the Union has repeatedly objected to Respondent's unilateral ground rule, and the parties have argued and deadlocked about the issue at most negotiation sessions.  Moreover, as parties first began bargaining on May 18, 2020, Respondent's insistence that non-economic terms be negotiated first has lasted even longer here than the four-month delay in *Sunbelt Rentals*.  Finally, Respondent's consistent refusal to bargain over economic subjects has prevented any progress from being made on non-economic subjects, as the Union has reasonably asserted its right to bargain over economic subjects, and productive bargaining requires interplay across all types of subject matter. Respondent's continuing refusal to make counterproposals or bargain over

---

2000); *Viking Connectors Co.*, 297 NLRB 95, 104-106 (1989); *South Shore Hosp.*,  245 NLRB 848, 848, 858-59 (1979) *enf'd*, 630 F.2d 40, 42-43 (1st Cir. 1980); *Federal Mogul Corp.*, 212 NLRB 950, 950-51, *enf'd*, 524 F.2d 37 (6th Cir. 1975).

mandatory economic subjects definitively establishes Respondent is refusing to bargain in good faith.

While Respondent's refusal to bargain over economic subjects establishes that Respondent is violating its obligation to bargain in good faith, Respondent has further demonstrated bad faith by restricting the parties' bargaining to six non-economic subjects that it has unilaterally selected. As the Board has noted, such an approach excludes "the opportunity to engage in the kind of 'horse trading' or 'give-and-take' that characterizes good-faith bargaining[22]." Instead, Respondent's limitation on what it will discuss gives it an unfair advantage in bargaining. As the Board has noted, "an employer that unilaterally removes certain bargaining subjects from negotiation can gain an advantage by excluding those subjects on which it may be more likely to give concessions to the union, reducing the likelihood that the parties will find common ground."[23] Additionally, "allowing an employer to unilaterally dictate which subjects the parties can bargain undermines the union, making it appear ineffective and weak to the employees. Thus, permitting bargaining only in those areas that the employer chooses would deny the union a fair opportunity to demonstrate its continued effectiveness…"[24]

Respondent's refusal to make counterproposals or bargain over any subject beyond six non-economic subjects it has unilaterally selected is definitive evidence that Respondent is violating the Act and refusing to bargain in good faith with the Union. There is no factual dispute in this case, and Respondent has failed to present any plausible defense under the law. Accordingly, the reasonable cause standard is clearly met in this case.

---

[22] *Endo Laboratories, Inc.,* 239 NLRB 1074, 1075 (1978).

[23] *T-Mobile USA, Inc.,* 365 NLRB No. 23 (2017).

[24] *Id.*

### V.     A PRELIMINARY INJUNCTION IS JUST AND PROPER

"[I]n the labor field, as in few others, time is crucially important in obtaining relief."[25] Respondent's illegal conduct threatens irreparable harm to the national labor policy encouraging good-faith collective bargaining embodied in Section 1 of the Act, obliterates the employees' right to organize under Section 7 of the Act, and threatens the efficacy of the Board's ultimate remedial order.

"[E]ncouraging … collective bargaining" is "the policy of the United States[.]"[26] Section 7 of the Act grants employees the right to decide whether they wish "to bargain collectively through representatives of their own choosing . . . ."[27] In this case, the employees exercised that right and freely selected their representative, but Respondent's unlawful actions are thwarting that choice, contravening the purposes of the Act.  As explained below, without timely interim relief, Respondent's unlawful tactics delaying bargaining will undermine—and have already begun undermining—the employees' support for the Union and deprive employees of the benefits of collective bargaining.  Over time, without an immediate injunction requiring good faith bargaining and instructing Respondent that it must bargain economic terms without further delay, these harms will be irreparable, and the Board's final remedial bargaining order will be ineffective. Respondent will succeed in permanently depriving its employees of Union representation through its illegal conduct, contrary to the Act's intent.

---

[25] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[26] 29 U.S.C. § 151.

[27] 29 U.S.C. § 157.

Respondent's bad faith and the resulting extensive delay to the collective-bargaining process is likely to irreparably erode employees' support for their chosen representative over time because it has resulted in a complete shutdown of negotiations and the Union is unable to protect the employees or affect their working conditions while the case is pending before the Board.[28]   The employees predictably will shun the Union because their working conditions will have been unaffected by collective bargaining for several years, while they wait for the Board's process to conclude and they will have little, if any, reason to support the Union.[29]   Indeed, the Union is particularly vulnerable here since it was certified only recently and is bargaining for a first contract.[30]   This lost support for the Union will not be restored by a final Board order in due course. By the time the Board issues its final order, it will be too late; employees will have given up on their union.[31]

---

[28] *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 49-50 (1987) (employer's refusal to bargain "'disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.'") (quoting *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944)); *NLRB v. Cayuga Crushed Stone, Inc.*, 474 F.2d 1380, 1384 (2d Cir. 1973) ("[T]he refusal to bargain itself … erodes the status of the Unions and discourages union membership."). *Cf. NLRB v. American Natl. Ins. Co.*, 343 U.S. 395, 402 (1952) ("Enforcement of the obligation to bargain collectively is crucial to the statutory scheme.").

[29] *See Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 369 (2d Cir. 2001); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297-98 (7th Cir. 2001); *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454-55 (1st Cir. 1990); *Chester v. Grane Healthcare Co.*, 666 F.3d 87, 102 (3d Cir. 2011); *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1362 (9th Cir. 2011) ("the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether"); *Dunbar v. Park Associates, Inc.*, 23 F. Supp. 2d 212, 218 (N.D.N.Y. 1998) ("further erosion of employee support for the [u]nion is likely the longer it remains absent from the collective bargaining process"), *affirmed*, 166 F.3d 1200 (2d Cir. 1998).

[30] *See Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992) ("The Union was only recently certified by the Board and the employees were bargaining for their first contract. These two facts make bargaining units highly susceptible to management misconduct"); *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 239 (6th Cir. 2003).

[31] *See, e.g., Hoffman*, 247 F.3d at 369 (since employers "can damage employee confidence in preexisting unions by simply failing to recognize them . . . there is a pressing need to preserve the status quo while the Board's final decision is pending."); *Bloedorn*, 276 F.3d at 299; *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) ("delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support"); *Electrical Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the

Indeed, the Union's status has begun to erode among the employees.  Several employees have expressed frustration with the delay in negotiations and are skeptical that Respondent will ever sign a contract.  In addition, one recalled union activist quit in July 2021, unable to wait for the Union to improve her working conditions, specifically, a room cleaning quota which the Union addressed in its initial contract proposal.  Another recalled supporter has stopped returning the Union's calls.

The Union's loss of support, in turn, will make the Board's final bargaining order ineffectual, leading to remedial failure.[32]  As the U.S. District Court for the Eastern District of New York recognizes, "[t]he erosion of support for the Union presents a threat of irreparable harm that justifies injunctive relief."[33]  The Union needs the support of the employees it represents in order to bargain effectively. Without support, the Union has no leverage and is "hard-pressed to secure improvements in wages and benefits at the bargaining table."[34]  With a weakened union, a final Board bargaining remedy will be unable to "recreate the original status quo with the same

---

employees."); *Centro Medico*, 900 F.2d at 454-55 ("there was a very real danger that if [the employer] continued to withhold recognition from the [u]nion, employee support would erode to such an extent that the [u]nion could no longer represent those employees").

[32] *See Bloedorn*, 276 F.3d at 299 (the longer a union "is kept…from working on behalf of . . . employees, the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining"); *Chester*, 666 F.3d at 102–103 (interim bargaining order necessary because "[a]n ultimate Board order that [the employer] recognize the Union may be ineffective if the Union has lost significant support"); *Small*, 661 F.3d at 1193 ("[w]ith only limited support . . . the [u]nion will be unable to bargain effectively regardless of the ultimate relief granted by the Board").

[33] *Paulsen v. Renaissance Equity Holdings*, 849 F. Supp. 2d 335, 360 (E.D.N.Y. 2012) (ordering employer to bargain in good faith under Section 10(j)).

[34] *Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396 (E.D. Pa. 2001). *See also Duffy Tool & Stamping, L.L.C. v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000) ("By undermining support for the union, the employer positions himself to stiffen his demands . . . knowing that if the process breaks down the union may be unable to muster enough votes to call a strike.").

relative position of the bargaining parties."[35]   In those circumstances, no meaningful, productive good-faith bargaining will occur under the Board's final order.[36]   For these reasons, numerous courts, including the Eastern District of New York, have recognized that an employer's bad-faith bargaining can cause irreparable harm.[37]   Respondent will defeat the Union, elude its bargaining obligation, and frustrate the intent of Congress by virtue of its unlawful actions.

Ordering Respondent to bargain in good faith with the Union now offers the only chance of preserving the Union's support before it is irrevocably diminished, thereby protecting employees' statutory right to choose representation and preserving the Board's remedial effectiveness.[38]

Loss of support for the Union is not the only irreparable harm caused by Respondent's refusal to bargain in good faith.   While Respondent is benefiting from its unlawful refusal to bargain in good faith pending Board litigation, the unit employees contemporaneously and

---

[35] Frankl, 650 F.3d at 1363. See also Dunbar, 23 F. Supp. 2d at 218 ("If the respondents refuse to bargain with the [u]nion and continue to withhold recognition, employee support will continue to erode to the point that any final order the NLRB might grant would be ineffective.").

[36] *See Electrical Workers*, 426 F.2d at 1249 (employer "may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively"); *Perez v. Noah's Ark Processors, LLC,* 2019 WL 2076793 at *5 (D. Neb. 2019) ("the Board's ultimate remedial action is likely to have little effect if it only results in compelling [the employer] to engage in collective bargaining with a Union that's already lost its base of support").

[37] *See, e.g., Paulsen v. All American School Bus Corp.*, 967 F. Supp. 2d 630, 645 (E.D.N.Y. 2013) ("because union members are likely blaming [the union] for being unable to prevent the financial and emotional harm they are experiencing as a result of the [employer's bad faith] best and final offer, consequently threatening the union with the loss of membership and bargaining clout, injunctive relief is necessary to 'prevent irreparable harm to the union's position in the [workplace]'"); *Small*, 661 F.3d at 1191 ("Given the central importance of collective bargaining to the cause of industrial peace, when the Director establishes a likelihood of success on a failure to bargain in good faith claim, that failure to bargain will likely cause a myriad of irreparable harms.").

[38] *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 39 (2d Cir. 1975) ("the district court has the power to order immediate bargaining to prevent irreparable harm to the union's position in the plant, to the adjudicatory machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective bargaining representatives."); *Scott v. Stephen Dunn*, 241 F.3d 652, 669 (9th Cir. 2001) ("[s]uccessful bargaining could restore the employees' interest in the Union").

irreparably suffer the loss of the benefits of good-faith collective bargaining and representation by their chosen Union.  The benefits of collective bargaining include negotiated improvements in terms and conditions of employment, such as scheduled wage increases or benefits packages, which Respondent has refused to bargain about.  A final Board order is "forward-looking" and will not compensate for the benefits that the Union might have secured through bargaining in the present.[39]  The lost benefits of representation also go beyond wages to include such items as recall rights, job security, safety and health conditions, and the protection of a grievance-arbitration procedure which, because they are non-monetary, cannot be made whole by a Board order in due course.[40]  Respondent here has not only refused to bargain over economic issues, but has also restricted bargaining on non-economic subjects to six isolated subjects (recognition, non-discrimination, no strikes or lockouts, probationary period, hours of work, and contract dates), refusing to discuss subjects like recall rights and a grievance procedure, thereby depriving employees of those non-economic benefits that may be most beneficial at this time of an ongoing pandemic and layoffs.

In contrast to these serious irreparable harms to the employees' rights, the Union's status, and the Board's remedial authority, any harm Respondent might suffer as a result of a preliminary injunction "will only last until the Board's final determination."[41]  An interim bargaining order under Section 10(j) is not permanent.[42]  The order would not compel agreement to any specific

---

[39] *See Bloedorn,* 276 F.3d at 299; *Small*, 661 F.3d at 1191-92; *Frankl*, 650 F.3d at 1363; *Chester*, 666 F.3d at 103.

[40] *See Small*, 661 F.3d at 1191-92 ("unions provide a range of non-economic benefits to employees that are not realized when an employer refuses to bargain with the union"). *See generally Scott*, 241 F.3d at 667 ("The value of the right to . . . representation is immeasurable in dollar terms").

[41] *Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986).

[42] *See Seeler*, 517 F.2d at 40 ("there is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision").

term or condition of employment advanced by the Union in negotiations.  Rather, it only requires

bargaining with the Union in good faith to an agreement or a bona fide impasse.[43]  Any agreement

reached between the parties under a Section 10(j) decree can contain a condition subsequent to

take into account the possibility of the Board's ultimate refusal to grant a final bargaining order

remedy.[44]  Also, the costs in terms of time and money spent on collective bargaining are burdens

that fall on both parties and do not defeat a request for an interim bargaining order.[45]  Accordingly,

the balance of hardships tips in the Regional Director's favor.

An interim bargaining order will also further the public interest in fostering collective

bargaining to safeguard industrial peace.[46]  Additionally, it will serve the public interest in

"ensur[ing] that an unfair labor practice will not succeed" because of the long administrative

process.[47]

The other requested relief is also just and proper. A cease-and-desist order is a standard

provision in any Section 10(j) preliminary injunction; it is necessary to restrain Respondent from

engaging in future unlawful conduct and assures employees that their rights will be protected.[48]

---

[43] *See Frankl*, 650 F.3d at 1048 ("When the company is not compelled to do anything except bargain in good faith, the risk from a bargaining order is minimal." (quoting *Small*, 661 F.3d at 1196)).

[44] *See, e.g., Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980).

[45] *See Scott*, 241 F.3d at 669.

[46] *See Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 469 (2d Cir. 2014) ("The principal purpose of a [Section] 10(j) injunction is to guard against harm to the collective bargaining rights of employees."); *Bloedorn*, 276 F.3d at 300-01; *Centro Medico*, 900 F.2d at 455 ("If the goal of the labor laws and regulations is to strengthen the bargaining process, then ordering bargaining . . . cannot be contrary to the public interest.").

[47] *Small*, 661 F.3d at 1197 (quoting *Frankl*, 650 F.3d at 1365-66). *See also Seeler*, 517 F.2d at 39 (the public interest is in "prevent[ing] frustration of the purposes of the Act"); *Bloedorn*, 276 F.3d at 300.

[48] *Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42, 45 (2d Cir. 2017) (summary order); *see also, e.g., Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1052 (W.D. Tenn. 2011) (cease-and-desist order appropriate "to prevent irreparable chilling of support for the Union among employees and to protect the NLRB's remedial powers.").

Additionally, posting the order during the pendency of the administrative proceedings will further inform and reassure employees of their rights.[49]

In sum, interim relief ensures that Respondent does not profit from its illegal conduct, protects the employees' Section 7 rights, safeguards the parties' collective bargaining process, preserves the remedial power of the Board, and effectuates the will of Congress.

## VI.    CONCLUSION

Based on the petition, the exhibits, and on the cited points and authorities, Petitioner respectfully asks the Court to issue a preliminary injunction as prayed for in the petition.

Dated on August 20, 2021.

  /s/ Brent Childerhose_____
Brent E. Childerhose
Regional Director, Region 29
National Labor Relations Board
Two MetroTech Center, Suite 5100
Brooklyn, NY 11201

---

[49] *See, e.g.*, *Drew-King v. Deep Distributors of Greater New York, Inc.*, 194 F.Supp.3d 191, 203 (E.D.N.Y. 2016) (ordering notice posting); *Blyer v. One Stop Kosher Supermarket, Inc.*, 720 F.Supp.2d 221, 228 (E.D.N.Y 2010) (same).