# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

### REGION 29

In the Matter of:

Troutbrook Company, LLC d/b/a    Case No.  29-CA-275229
Brooklyn 181, Hospitality,
LLC,


and

New York Hotel and Motel
Trades Council, AFL-CIO.


_____

_____


Place: Brooklyn, New York (Via Zoom Videoconference)

Dates: August 3, 2021

Pages: 1 through 92

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

www.escribers.net | 800-257-0885

ATTACHMENT A

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 29**

| | |
|---|---|
| In the Matter of:<br><br>TROUTBROOK COMPANY, LLC D/B/A<br>BROOKLYN 181, HOSPITALITY,<br>LLC,<br><br>and<br><br>NEW YORK HOTEL AND MOTEL<br>TRADES COUNCIL, AFL-CIO. | Case No.   29-CA-275229 |

The above-entitled matter came on for hearing, pursuant to
notice, before **LAUREN ESPOSITO**, Administrative Law Judge, at
the National Labor Relations Board, Region 29, Two MetroTech
Center, Suite 5100, Brooklyn, New York 11201, on **Tuesday,
August 3, 2021, 9:30 a.m.**

1 <u>A P P E A R A N C E S</u>

2 **On behalf of the Charging Party:**

3 　　**GIDEON MARTIN, ESQ.**
　　NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO.
4 　　707 8th Avenue
　　New York, NY 10036-7111

5

　**On behalf of the Respondent:**

6

7 　　**LOUIS DILORENZO, ESQ.**
　　**RAYMOND PASCUCCI, ESQ.**
　　BOND, SCHOENECK & KING, PLLC.
8 　　One Lincoln Center
　　100 West Fayette Street
9 　　Syracuse, NY 12302-1355

10 **On behalf of the General Counsel:**

11 　　**BRENT CHILDERHOSE, ESQ.**
　　THE NATIONAL LABOR RELATIONS BOARD, REGION 29
12 　　Two MetroTech Center North, 5th Floor
　　Brooklyn, NY 11201

13

14

15

16

17

18

19

20

21

22

23

24

25



ATTACHMENT A

1 **I N D E X**

2

3 | **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** | **VOIR DIRE** |
|---|---|---|---|---|---|
| 4 Gideon Martin | 10 | 43 | | | |
| 5 Raymond Pascucci | 66 | 80 | 85 | 87 | |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

ATTACHMENT A

1                     **E X H I B I T S**

2

| 3 | **EXHIBIT** | **IDENTIFIED** | **IN EVIDENCE** |
|---|---|---|---|
| 4 | **Respondent:** | | |
| 5 | R-1 | 20 | 20 |
| 6 | **General Counsel:** | | |
| 7 | GC-1 | 16 | 16 |
| 8 | GC-2(a) | 16 | 16 |
| 9 | GC-2(b) | 16 | 16 |
| 10 | GC-2(c) | 16 | 19 |
| 11 | GC-2(d) | 22 | 27 |
| 12 | GC-2(e) | 19 | 19 |
| 13 | GC-2(f) | 29 | 35 |
| 14 | GC-2(g) | 29 | 35 |
| 15 | GC-2(h) | 19 | 19 |
| 16 | GC-2(i) | 35 | 36 |
| 17 | GC-2(j) | 19 | 19 |
| 18 | GC-2(k) | 38 | 39 |
| 19 | GC-2(l) | 39 | 39 |
| 20 | GC-2(m) | 19 | 19 |
| 21 | GC-2(n) | 40 | 41 |
| 22 | GC-2(o) | 40 | 41 |
| 23 | GC-2(p) | 19 | 19 |
| 24 | GC-3 | 58 | 58 |

25



1               **P R O C E E D I N G S**

2          JUDGE ESPOSITO:  This is a formal hearing before the

3     National Labor Relations Board in the matter of Troutbrook

4     Company, LLC d/b/a Brooklyn, 181 Hospitality, LLC, case number

5     29-CA-275299.  The Charging Party is New York Hotel and Motel

6     Trades Council, AFL-CIO.  The complaint was issued by Region 29

7     in Brooklyn, New York.  My name is Lauren Esposito, and I am

8     the administrative law judge who will be presiding over the

9     hearing and issue -- and issuing a decision in the case.

10          Because of the COVID-19 pandemic, the hearing is being

11     conducted remotely using the Zoom for Government video

12     conferencing platform.  The procedures and protocols for the

13     Zoom hearing were previously discussed with the parties during

14     a pre-hearing conference.  Detailed written instructions and

15     protocols were also issued.  Because conducting or

16     participating in a Zoom hearing may be new to some, there may

17     be times when things move a bit slower than they would during

18     an in-person hearing.  With a little patience and cooperation,

19     we will all get through it.

20          For those of us who have joined only to observe the

21     hearing, I remind you to keep both your audio and your video

22     app turned off at all times.  Any violation of this instruction

23     or other disruption will result in your immediate removal and

24     possible referral to both Zoom and the federal authorities for

25     other sanctions.



ATTACHMENT A

1          I remind everyone, both participants and observers, again,

2     that no videotaping or audio recording is permitted.  Only the

3     court reporter may record the hearing in order to prepare the

4     official record.  Again, any violations may result in removal

5     and other sanctions.

6          Will Counsel please state their appearances for the

7     record?  For the General Counsel?

8          MR. CHILDERHOSE:  Brent Childerhose.

9          JUDGE ESPOSITO:  And for the Respondent?

10          UNIDENTIFIED SPEAKER:  You're mute, Lou.

11          JUDGE ESPOSITO:  Yeah, can you -- you need to --

12          MR. DILORENZO:  Lou DiLoren -- Louis DiLorenzo from Bond,

13     Schoeneck, & King in New York.

14          JUDGE ESPOSITO:  And for the Charging Party?

15          MR. MARTIN:  Gideon Martin.

16          JUDGE ESPOSITO:  Are there any issues the parties wish to

17     deal with on the record before they make their opening

18     statements?

19          MR. CHILDERHOSE:  Nothing here, Your Honor.

20          JUDGE ESPOSITO:  Mr. DiLorenzo?  You're muted, Mr.

21     DiLorenzo.

22          MR. DILORENZO:  Nothing here, Your Honor.

23          JUDGE ESPOSITO:  Okay, thank you.

24          Mr. Martin?

25          MR. MARTIN:  Nothing from the Charging Party, Your Honor.



1          JUDGE ESPOSITO:  All right.

2          Mr. Childerhose, would you like to make an opening

3     statement for General Counsel?

4          MR. CHILDERHOSE:  I would, Your Honor.  Good morning.

5     Respondent in this case refuses to bargain in good faith with

6     the Union.  As background, the Union was certified as the

7     bargaining representative for the Respondent's employees back

8     on September 24th, 2018.  After the Union was certified,

9     Respondent refused to meet and bargain.  Region issued

10    complaint which resulted in a Board order dated June 3rd, 2019.

11    Court of Appeals for the DC Circuit enforced that order and

12    issued its mandate on April 22nd, 2020.  Only then did

13    Respondent agree to meet with the Union.

14         Parties first met on May 18th, 2020.  They met again twice

15    in June 2020.  Due to the effects of the pandemic, there was a

16    pause in the parties meeting until negotiations resumed

17    February 2nd, 2021.  Parties have now met a total of six times,

18    with the last meeting taking place on April 21st of this year.

19         Despite meeting six times, no substantive process (sic)

20    has been made.  The reason for this?  Respondent is unlawfully

21    insisting on ground rules designed to frustrate bargaining.

22    Specifically, Respondent insists that bargaining be limited to

23    a subset of noneconomic issues, unilaterally chosen by

24    Respondent, that must first be resolved before any other issues

25    can be addressed.  Although the Union provided Respondent the



1   complete proposal at the bargaining -- at the beginning of

2   bargaining in May 2020, Respondent refuses to provide a

3   comprehensive counterproposal and refuses to bargain over

4   economic issues until all noneconomic issues have been

5   resolved.

6       While the Union has repeated objected to what Respondent

7   is doing, Respondent is undeterred.  What Respondent is doing

8   clearly constitutes bad faith.  The evidence is clear, and

9   there is no substantive, factual dispute in this case.  Nor is

10  there any question that Respondent's tactics are unlawful.  In

11  the decision they issued earlier this year, Sunbelt Rentals,

12  Inc., 380 NLRB No. 102, the Board held that it is unlawful for

13  an employer to refuse to bargain over economic subjects until

14  all noneconomic subjects have been resolved.  This is exactly

15  what Respondent is doing.

16      As such, the General Counsel requests that Your Honor find

17  Respondent is refusing to bargain in good faith and must cease

18  and desist from violated the act.  Thank you.

19  JUDGE ESPOSITO:  Okay, just one minute.  Okay, Mr.

20  Childerhose, the Sunbelt Rental case, you said 380 NLRB.  Do

21  you mean 370?

22  MR. CHILDERHOSE:  I'm going to have to doublecheck.  It's

23  a 2021 case.

24  JUDGE ESPOSITO:  Okay.  So then it would probably be 370.

25  MR. CHILDERHOSE:  Okay.  I had a typo in my notes.  Thank

1  you, Your Honor.

2      JUDGE ESPOSITO:  Okay.  So it's 370 No. 102?  I just want

3  to make sure I got that right.

4      MR. CHILDERHOSE:  Correct.

5      JUDGE ESPOSITO:  Okay.  370 No. 1 -- Sunbelt Rentals.

6  Okay, thank you.

7      Mr. DiLorenzo, would you like to make your opening

8  statement now or wait until the beginning of Respondent's case?

9      MR. DILORENZO:  Your Honor, we would like to wait until we

10 present our case.  Thank you.

11     JUDGE ESPOSITO:  Sure.

12     Okay, General Counsel, is there anything else before you

13 call your first witness?

14     MR. CHILDERHOSE:  There's not, Your Honor.

15     JUDGE ESPOSITO:  Okay.  All right, go ahead and call your

16 first witness.

17     MR. CHILDERHOSE:  General Counsel calls Gideon Martin.

18     JUDGE ESPOSITO:  All right.  Mr. Martin, can you please

19 raise your right hand so that we can all see it?  Thank you.

20 Whereupon,

21                          **GIDEON MARTIN**

22 having been duly sworn, was called as a witness herein and was

23 examined and testified as follows:

24     JUDGE ESPOSITO:  Can you please state and spell your full

25 name for the record?



1          THE WITNESS:  Gideon Martin.  G-I-D-E-O-N M-A-R-T-I-N.

2          JUDGE ESPOSITO:  Thank you, Mr. Martin.  Let me just

3    remind you about a few things before Mr. Childerhose begins his

4    questioning.

5          First, it's very important that you listen carefully to

6    each question.  Do not start speaking or answering until you're

7    sure the question is finished, so that the court reporter can

8    hear everything that's going on and the person who transcribes

9    the tape is not dealing with more than one person speaking at

10   the same time.

11         If someone objects, do not answer the question

12   immediately.  Wait for me to rule on the objection.

13         Third, let us know right away if you're having trouble

14   with your audio or video.  Interrupt whatever else is going on.

15   Tell us that you are having problems or wave your hand in front

16   of the camera where we can see it.  If you lose your audio or

17   video completely, check your power and internet connections and

18   reconnect or reboot the device if necessary.  Then, attempt to

19   join the hearing using the same link that I sent out last week,

20   and that should work.

21         THE WITNESS:  Very good.

22         JUDGE ESPOSITO:  Okay.  Go ahead, Mr. Childerhose.

23                      **DIRECT EXAMINATION**

24   Q    BY MR. CHILDERHOSE:  Mr. Martin, what is your position

25   with the Union?



1    A    I'm Assistant General Counsel.

2    Q    Okay.  And how are you familiar with the Employer in this

3    case?

4    A    The Employer is one of the hotels that our Union has

5    organized.

6    Q    Okay.  And this is admitted in the Employer's answer, but

7    the Union was certified on September 24th, 2018; is that

8    correct?

9    A    That's right.

10   Q    And generally, what are the categories of employees in

11   that -- in the bargaining unit?

12   A    I -- to my knowledge, it's housekeeping employees.  For

13   example, room attendants and housepersons.  I believe there's

14   also food and beverage employees in the classification.  I

15   believe there's additional items in the class -- excuse me,

16   additional classifications in the bargaining unit, as well.

17        MR. CHILDERHOSE:  Okay.  And Your Honor, I have, -- in my

18   Exhibit 2, I've included the Court of Appeals -- their

19   judgment, and then also the mandate.  As far as putting those

20   into evidence, is that something that can just be done

21   administratively?

22        JUDGE ESPOSITO:  Is there any objection to the admission

23   of the court of appeals judgment filed on February 28th, 2020

24   and the mandate filed on April 22nd, 2020, Mr. DiLorenzo?

25        MR. DILORENZO:  Yeah, I'm not -- I'm not sure the



1   relevancy.  And I don't understand if it's appropriate to put

2   cases into -- into evidence.  There's an earlier case where the

3   objections to the election were upheld -- one of the objections

4   was upheld and the new objection was directed.  And the other

5   objections -- that case deals with the objections that weren't

6   addressed in the first case, I believe.  But I think, to make

7   the record complete, if things are going to go in, all those

8   cases should go in.

9        If the implication is that we did something wrong by

10   exercising our right to properly object to an election or to

11   continue to object to an election where only one of the

12   objections was dealt with and sustained so that a new election

13   was held, I think that it's a little improper to cherry-pick

14   the second one to argue that we didn't do anything until we

15   were directed to bargain.

16        JUDGE ESPOSITO:  Okay.

17        MR. DILORENZO:  I mean, it was a technical refusal to

18   bargain.  We have the right to do that.  We exercised our

19   rights.  It's America.  I don't understand -- I don't

20   understand the implication of trying to cherry-pick this and

21   say that this was a refusal to bargain case.

22        JUDGE ESPOSITO:  Okay.  We'll -- well, Mr. Childerhose, is

23   the General Counsel arguing that Respondent somehow unlawfully

24   refused to bargain during that period when the case involving

25   the objections was pending or prior to the mandate of the DC

1    Circuit?  Or is --

2        MR. CHILDERHOSE:  Well, it provides -- it provides

3    background and context to this.  But I will say, the Employer's

4    testing certification was found to be unlawful.  It did not

5    have merit, and it was done in bad faith.

6        MR. DILORENZO:  How about the first -- how about the first

7    testing?  How about the first testing?  You admit that that one

8    was lawful?

9        MR. CHILDERHOSE:  The first testing?  I mean, there was

10   just one Employer case that I'm familiar with.  What --

11       MR. DILORENZO:  Where the objection was upheld -- where

12   the objection was upheld and in --

13       JUDGE ESPOSITO:  Yeah, because from the -- what Mr.

14   DiLorenzo is saying, from the DC Circuit's opinion, the

15   February 28th, 2020 judgment, it appears that there was a

16   second election, Mr. Childerhose.

17       MR. CHILDERHOSE:  There was a rerun election.  I mean that

18   I -- I don't know the relevance of that.  You know, our

19   interest is with regard to Employer's -- the Employer's

20   behavior after the certification to bargaining unit, which has

21   continued -- you know, this Union was certified back in the

22   fall of 2018.  And the Employer has continued to refuse to

23   bargain in good faith with this Union.

24       JUDGE ESPOSITO:  Okay.  So Mr. DiLorenzo --

25       MR. DILORENZO:  I object, Your Honor.  I think it's

1    improper.  I think it's bad government programming to do this.

2    So I object.  You can make your ruling, whatever you want.

3         JUDGE ESPOSITO:  Okay.

4         MR. DILORENZO:  But I object.

5         JUDGE ESPOSITO:  All right.  Well here's what I'm going to

6    do.  I'm going to admit the February 28th, 2020 judgment of the

7    DC Circuit and the April 22nd, 2020 mandate.

8         And then, Mr. DiLorenzo, if you would like to either refer

9    me to previous decisions of the Board or of whichever Court of

10   Appeals may have handled the initial objections before the

11   second election, or if you would like to introduce into

12   evidence decisions or documents relevant to that sort of phase

13   of the post-election proceedings, then I'll allow you to do

14   that and I'll admit those documents.  Okay?

15        MR. DILORENZO:  Thank you, Your Honor.

16        MR. PASCUCCI:  Your Honor -- I'm sorry.  Could I make a

17   clarifying statement?

18        JUDGE ESPOSITO:  Sure.  Go ahead, Mr. Pascucci.

19        MR. PASCUCCI:  So there was no prior Board decision or

20   court of appeals decision.  The first election -- the region --

21   the post-election objections were filed in the first election.

22   The region determined that there needed to be a rerun election.

23   They actually referred it to a different region, I think Region

24   25.

25        JUDGE ESPOSITO:  Um-hum.



1       MR. PASCUCCI:  Sent it to -- I forget the region in New

2   Jersey number, but they sent it to a different region.  That

3   region then conducted the second election.  So that was the

4   case history.

5       JUDGE ESPOSITO:  Okay.

6       MR. PASCUCCI:  And then there was the technical refusal to

7   challenge the legitimacy of the second election, which, you

8   know, ultimately, the court of appeals ruled against the

9   Employer, at which point we began to bargain.

10       JUDGE ESPOSITO:  Okay.  All right, I understand.  So if

11   there are documents that are pertinent to the direction of the

12   second election or any other documents pertinent to sort of the

13   R case proceedings that you would like to have admitted into

14   evidence, I'll admit those to evidence, assuming they can be

15   authenticated.  And I don't anticipate, if it's some document

16   that was issued by the region or the Board or a court, that

17   there's going to be some sort of issue with authentication.

18   Okay?

19       MR. DILORENZO:  Thanks, Your Honor.

20       MR. CHILDERHOSE:  Your Honor, I did realize I haven't

21   moved or we haven't -- I don't think we've received into

22   evidence the formal papers yet.

23       JUDGE ESPOSITO:  All right.  Is there any objection to the

24   admission of the formal papers, Mr. DiLorenzo?

25       MR. DILORENZO:  No, Your Honor.



1      JUDGE ESPOSITO:  Okay.  So then the formal papers, marked

2  as General Counsel Exhibit 1, are admitted.

3  **(General Counsel Exhibit Number 1 Received into Evidence)**

4      JUDGE ESPOSITO:  Okay.  And so Mr. Childerhose, so the

5  February 28th judgment and the April 22nd mandate -- I

6  should -- this is just pages 1 through 3 of General Counsel's

7  Exhibit 2 or 1 through 5 of General Counsel's Exhibit 2?  Is

8  that how you're referring to them or are they their own

9  exhibit?

10     MR. CHILDERHOSE:  Yeah, so I put a subsection on at the

11  bottom right corner of each page.  So the judgment is --

12     JUDGE ESPOSITO:  I see.

13     MR. CHILDERHOSE:  So this is all General Counsel Exhibit

14  2.

15     JUDGE ESPOSITO:  Okay.

16     MR. CHILDERHOSE:  2(a) is the judgment, which is four

17  pages.  And then 2(b) is the mandate, which is one page.

18     JUDGE ESPOSITO:  Okay.  So then General Counsel Exhibit

19  2(a) and 2(b) are admitted.

20  **(General Counsel Exhibit Numbers 2(a) and 2(b) Received into**

21  **Evidence)**

22     JUDGE ESPOSITO:  Go ahead, Mr. Childerhose.

23  Q    Mr. Martin, if I can refer you to what's marked for

24  identification in General Counsel's Exhibit 2(c).

25  A    Just one moment while I pull that up here.  Okay.



ATTACHMENT A

1   Q    Okay.  Do you recognize this document or can you identify

2   this document?

3   A    I do, yes.  I recognize these, and these are bargaining

4   notes.

5   Q    Okay.  So after -- after the DC Circuit's mandate, can you

6   tell us what happened next with regard to the parties?

7   A    Yes.  I reached out to the Employer in the form of Mr.

8   Pascucci, counsel to the Employer, to engage in bargaining.

9   Q    Okay.  And when was the first session held?

10  A    I believe the first session was -- was held in May.

11  Q    Okay.  Was that May 18th as referenced in the notes?

12  A    That's right.  And to be clear, this is of 2020.

13  Q    Yep.  And who was present at that -- what -- how was --

14  logistically, how was that session held?

15  A    This was the height of the pandemic.  So it was held

16  telephonically, as were all bargaining sessions.

17  Q    Okay.  And who participated in the first session?

18  A    This first session for the Union was then-General Counsel

19  Rich Maroko, myself, as well as Arisha Sierra-Blas from our

20  organizing department.

21  Q    Okay.  And have every -- who took the notes that are --

22  the notes that constitute GC Exhibit 2(c)?

23  A    Actually, I believe at this session there was also present

24  another member from my department, the legal department, Ms.

25  Burgos (phonetic throughout), who took these notes.



1    Q    Okay.  Have you reviewed these notes?

2    A    I have, yes.

3    Q    And are these notes an accurate reflection of what

4    happened at the meeting?

5    A    Yes.

6         MR. CHILDERHOSE:  Okay.  I'd like -- so I'll move the

7    admission -- I think we've already stipulated that all the

8    notes will go in, Your Honor, both for the Employer and the

9    Union's notes.  I guess this would be the first set of the

10   Union's notes that we have.

11        JUDGE ESPOSITO:  Okay.

12        MR. CHILDERHOSE:  Do I need to move the admission of

13   these, or have these been received as evidence?

14        JUDGE ESPOSITO:  Well -- well -- well, let me just ask,

15   because off the record, we did discuss the notes and the

16   admissibility of the bargaining notes taken by both the

17   Charging Party and the Respondent.  And so the -- so Mr.

18   Childerhose, you're -- are you willing to stipulate to the

19   admissibility of the bargaining notes taken both by the

20   Charging Party and the Respondent?

21        MR. CHILDERHOSE:  I am, yes.

22        JUDGE ESPOSITO:  Okay.  Mr. DiLorenzo, are you also

23   willing to stipulate to the admissibility of the bargaining

24   notes taken by both the Charging Party and the Respondent?

25        MR. DILORENZO:  Yes, Your Honor.

1   JUDGE ESPOSITO:  Okay.  So then General Counsel's Exhibit

2   2(c) is admitted.

3   **(General Counsel Exhibit Number 2(c) Received into Evidence)**

4   MR. CHILDERHOSE:  Okay.  And for reference, I don't have

5   the Employer's notes in my Exhibit 2, though -- though, again,

6   we agree to have those put into the record.  The bargaining

7   notes I do have are marked for identification as GC 2(c); GC

8   2(e), which is June 4th, 2020; and then we have GC 2(h), which

9   is June 25th, 2020; 2(j), which is February 2nd, 2021; 2(m),

10  which is March 11th, 2021; and then 2(p), which is April 21st,

11  2021.

12  JUDGE ESPOSITO:  Okay.  So that was 2(c), (e), (h), (j),

13  (m), and (p); is that correct?

14  MR. CHILDERHOSE:  Correct.

15  **(General Counsel Exhibit Numbers 2(e), 2(h), 2(j), 2(m), and**

16  **2(p) Received into Evidence)**

17  JUDGE ESPOSITO:  Okay.  And Mr. DiLorenzo, how would you

18  like to mark the Respondent's notes?  Would you like that

19  marked as Respondent Exhibit 1?

20  MR. DILORENZO:  We could do that, Your Honor.

21  JUDGE ESPOSITO:  Okay.

22  MR. DILORENZO:  We could do that 1(a) through -- you want

23  them all marked as 1?  Do you want some --

24  JUDGE ESPOSITO:  Yeah.  Why don't we just -- why don't we

25  just have it marked as one document, because it --



1        MR. DILORENZO:  Okay.

2        JUDGE ESPOSITO:  The one document seems to contain the

3    notes of all the bargaining sessions.

4        MR. DILORENZO:  That's fine.  That's fine.

5        JUDGE ESPOSITO:  Okay.  So then Respondent's notes of the

6    bargaining sessions, a three-page document that's been marked

7    as Respondent Exhibit 1, entitled Brooklyn Fairfield Hotel and

8    the New York Hotel & Motel Trades Council (Union or HTC), is

9    admitted.

10   **(Respondent Exhibit Number 1 Received into Evidence)**

11   Q    Okay.  Mr. Martin, if I could have you look at General

12   Counsel's Exhibit 2(d) for subsection (B).

13   A    Yes, let me just pull that up, please.  You said (d), Mr.

14   Childerhose?

15   Q    Yes.

16   A    Okay.

17   Q    Okay.  Do you recognize this document?

18   A    I do.

19   Q    And what is this document?

20   A    This is a copy of the initial collective bargaining

21   agreement proposal that the Union sent to the Employer.

22   Q    Okay.  And it appears in the bargaining notes there's

23   reference to the Union's proposal.  Is that what this is?

24   A    That's right.

25       MR. CHILDERHOSE:  Okay.  I would move the admission of



1    2 -- 2(d), Your Honor.

2          MR. PASCUCCI:  Can you --

3          JUDGE ESPOSITO:  I --

4          MR. PASCUCCI:  I apologize.  I realize this is awkward

5    because I'm not the attorney and we're doing this by Zoom, but

6    I'd like to confer with my counsel on this -- on whether we

7    would object to this exhibit or not.  I could state the basis,

8    if that's the most efficient way to do this.

9          JUDGE ESPOSITO:  No.  No, I think you should confer with

10   Mr. DiLorenzo.  Do you need to have a breakout room to do that?

11         MR. PASCUCCI:  Yeah, that would be great, Judge.

12         JUDGE ESPOSITO:  Okay.  All right, just give me a minute.

13         THE COURT REPORTER:  I'm going to go off the record.

14         JUDGE ESPOSITO:  Yes, I'm sorry, Barry.  Can you just go

15   off the record?

16   (Off the record at 10:11 a.m.)

17         MR. DILORENZO:  Yes, Your Honor.  Thank you for that

18   opportunity to confer --

19         JUDGE ESPOSITO:  Sure.

20         MR. DILORENZO:  -- with Mr. Pascucci.  So Your Honor, we

21   heard the testimony from Mr. Gideon and this is the proposal

22   that he sent to the -- to the company that morning or that day

23   before the negotiations.  But --

24         JUDGE ESPOSITO:  Um-hum.

25         MR. DILORENZO:  Our information is that the IWA, the



1    industry-wide agreement, which is roughly 100 pages, was sent

2    that morning along with the rider, which is the document that's

3    been presented here as the proposal.  But you know, this is a

4    small percentage of the proposal that was sent.  The proposal

5    was the IWA.  And if you look at the notes, you'll see that the

6    first entry is:

7              "Our General Counsel Rich explains the Union's

8              proposal that we sent to them this morning.  We

9              propose the IWA, our master contract, with the

10             changes that are better than what we currently have."

11   So we would want that agreement to be part of this Exhibit

12   as to what was sent that morning as the proposal.  The 100

13   pages is missing.

14        JUDGE ESPOSITO:  Okay.  Mr. Childerhose?

15        MR. CHILDERHOSE:  We can ask the witness for

16   clarification.

17        JUDGE ESPOSITO:  Sure, go ahead.

18                    **RESUMED DIRECT EXAMINATION**

19   Q    BY MR. CHILDERHOSE:  Mr. Martin, can you clarify with

20   regard to what 2(d) is, and what -- what was proposed to the

21   Employer?

22   A    Yes.  Certainly.  So 2(d) is the memorandum of -- of

23   understanding that we drafted, that I had sent to Mr. Pascucci

24   the same day as that first bargaining session.  And this is a

25   multi-page document that lays out several terms and conditions

ATTACHMENT A

1   that we were proposing, including in paragraph 1, enumerated

2   paragraph number one, incorporation of the industry-wide

3   agreement that Mr. DiLorenzo referred to.

4        MR. CHILDERHOSE:  I don't have a copy of the industry-wide

5   agreement.  I don't think it has to be in the record, so I --I

6   would still move for the admission of this document and Mr.

7   Martin has explained what it is.

8        MR. DILORENZO:  Well, Your Honor, I would object if it's

9   being offered as the proof of the offer that was sent that

10  morning.  It's 16 out of 116 pages.

11       JUDGE ESPOSITO:  Okay.  Well, I'm -- I'm not clear as to

12  whether the IWA was actually provided to Respondent or -- or

13  not.

14  Q    BY MR. CHILDERHOSE:  Mr. Martin, was the IWA provided to

15  Respondent?

16  A    It was, yes.

17       MR. DILORENZO:  So we have no objection -- just to be

18  clear, Your Honor, I don't have any objection to the -- to

19  this -- to what was submitted that day going into evidence, but

20  it would include the IWA agreement.

21       MR. CHILDERHOSE:  I think the record is clear the IWA was

22  part of the Union proposal.  I -- I don't think it has to be

23  included in the record given, you know, given the facts and the

24  allegation that's at issue.  I don't think it adds anything to

25  include it --


www.escribers.net  |  800-257-0885

ATTACHMENT A

1          MR. DILORENZO:  Really --

2          MR. CHILDERHOSE:  -- you know, an additional hundred pages

3     into -- into the record.

4          MR. DILORENZO:  My God.  You've got to be kidding me.  I

5     don't know if you've ever --

6          JUDGE ESPOSITO:  All right, all right, Mr. --

7          MR. DILORENZO:  -- done collective bargaining before, but

8     when some -- the issue in this case is whether it was a take it

9     or leave it IWA agreement.  Are you serious that it's not

10    relevant --

11         JUDGE ESPOSITO:  All right, all right --

12         MR. DILORENZO:  -- to what was produced?

13         JUDGE ESPOSITO:  All right, all right, Mr. DiLorenzo, I

14    understand.  Yes, I think the IWA also should be a part of the

15    record since it was part of the Union's initial proposal and is

16    referred to in General Counsel's Exhibit 2(d).

17         So I think that, in order to have a complete record, the

18    IWA should be included.  And it appears to me from the

19    testimony, and correct me if I'm wrong, that the I -- actual

20    IWA was also sent to the Respondent at -- at around the same

21    time as this General Counsel Exhibit 2(d) was.

22         So I -- I do think it should be part of the record.  Mr.

23    Childerhose, if you want to offer it that's fine, or Mr.

24    DiLorenzo, if you would like to, but -- but I do think that it

25    should be part of the record since it was part of the proposal,

1    the Union's proposal, and it was clearly discussed by the

2    parties in the context of their collective bargaining

3    negotiations, according to the notes that I've looked at

4    anyway.  So I don't care who wants to do it or how, but it --

5    it should be a part of the record.

6         MR. CHILDERHOSE:  And I -- I don't object to it being

7    included into evidence.  I -- I -- I -- I don't have a copy of

8    it, so but -- but if -- but if Mr. DiLorenzo, do you have a

9    copy, or if Mr. Martin can provide it, I don't object it being

10   included into evidence.

11        JUDGE ESPOSITO:  Okay.

12        MR. DILORENZO:  I -- I -- I think for the purposes of the

13   record it should be part of this Exhibit, so we keep it

14   straight, but I'll -- I'll introduce it, if you want it as a

15   separate Exhibit.  I mean, as long as it's part of the record

16   but it just seems to me if we are giving testimony about what

17   was sent that morning, I don't think the record should be

18   confusing.  A lot of actions that we took were based on the

19   fact that that the IWA agreement was sent that morning.

20        JUDGE ESPOSITO:  Let me -- let me -- let me just clarify

21   with Mr. Martin.  Mr. Martin, was the IWA also sent that

22   morning with General Counsel Exhibit 2(d)?

23        THE WITNESS:  Yes, Your Honor.

24        JUDGE ESPOSITO:  Okay.  So here's

25        MR. PASCUCCI:  If --



1        JUDGE ESPOSITO:  I'm sorry, Mr. Pascucci, go ahead.

2        MR. PASCUCCI:  I apologize.  If I could interject for a

3   moment.  The -- the version that was sent to us back in -- when

4   this meeting took place, which I guess was May of 20 -- what

5   year are we in -- 2020 --

6        MR. CHILDERHOSE:  May 18, 2020.

7        MR. PASCUCCI:  Okay, thanks.  I'm not sure that the --

8   what years, what version it was.  I think if the Union could

9   produce it now, that would be helpful.  You know, this was sent

10  to me by email years ago, and I was just searching for it on my

11  computer, on my laptop, and I'm not finding it.

12       But I think -- I think the objection that Mr. DiLorenzo

13  was asserting is to -- to treat it as a partial -- you know,

14  part of the Union's proposal is not introducing all of the

15  Union's proposal -- so it seems to me that the General Counsel

16  should, and/or the Charging Party, should produce this

17  document, and make it a part of the Exhibit, so that both can

18  be admitted simultaneously.

19       JUDGE ESPOSITO:  Okay.  Here's what we are going to do.  I

20  don't want to hold up the hearing now, while people go back and

21  find the version of the IW -- the right version of the IWA.

22  I'm going to admit General Counsel Exhibit 2(d) as it is now,

23  with the understanding that the record will somehow be

24  supplemented with the complete version of the IWA that was

25  provided to the Respondent the morning of the first negotiating

ATTACHMENT A

1    session with General Counsel Exhibit 2(d).  And General

2    Counsel, Mr. Martin can do that, or Respondent can do that.

3    Either way is -- is fine.

4         So for now, General Counsel Exhibit 2(d) is admitted with

5    the understanding that the IWA, or a version of the IWA, was

6    also provided to the Respondent the morning of the first

7    negotiating session, and the record will be supplemented with

8    that version of the IWA.

9    **(General Counsel Exhibit Number 2(d) Received into Evidence)**

10        JUDGE ESPOSITO:  Okay.  Go ahead Mr. Childerhose.

11   Q    BY MR. CHILDERHOSE:  Okay, and Mr. Martin, is -- is that

12   something that can be provided?

13   A    I -- I, again, I don't have a copy of the IWA, so I can't

14   commit to providing it myself, because I don't have it.

15        Your Honor, let me just step in and try to make this

16   easier for everyone.  I will find the -- the version that was

17   provided to the Employer and I will circulate it via email to

18   everybody who is part of this Zoom.

19        JUDGE ESPOSITO:   Okay.

20        MR. PASCUCCI:  Thank you.

21        THE WITNESS:  I will do that after -- I guess after I get

22   off the stand, or during a recess.

23        JUDGE ESPOSITO:  Yes.  We can -- it depends on how long --

24   we can take a break or if worse comes to worse, we can hold the

25   record open for it -- for the admission of that document.



1          THE WITNESS:  I can do it very quick.

2          JUDGE ESPOSITO:  Okay.  Go ahead, Mr. Childerhose.

3    Q    BY MR. CHILDERHOSE:  Okay.  Did -- did the Employer

4    provide any counterproposal at that first meeting on May 18,

5    2020?

6    A    Not a counterproposal at the first meeting, no.

7    Q    Okay.  How -- about how long did that meeting last?

8    A    To my recollection, not very long.  It was a bit more

9    introductory than anything.  Perhaps half an hour.

10   Q    Okay.  I'd like to show you, or have you look at General

11   Counsel's Exhibit 2(e).

12          THE COURT REPORTER:  One moment.  I apologize, one moment.

13   I have these, unfortunately, out of order.  Thank you for your

14   patience.  E as in elephant, Mr. Childerhose?

15          MR. CHILDERHOSE:  Correct.

16          THE COURT REPORTER:  Yes.  Okay.

17   Q    BY MR. CHILDERHOSE:  Okay.  Do you recognize this

18   document?

19   A    I do, yes.  These are bargaining notes from a June 4th,

20   2020, bargaining session.

21   Q    Okay.  After the May 18, 2020, session when did the

22   parties next meet?

23   A    On June 4th.

24   Q    Okay.  And have you reviewed these notes?

25   A    I have, yes.



1    Q    And who typed these notes?

2    A    These notes were typed by legal operations assistant for

3    the Union, Julissa Sanchez.

4    Q    Okay, and are these -- these notes accurate, Mr. -- as

5    reflecting what took place at the second meeting?

6    A    Yes.

7    Q    Was there -- was there any agreement reached at the second

8    meeting?

9    A    There was not.

10   Q    Okay.  Given these notes are detailed, they're already in

11   evidence, I guess we'll go ahead and move forward.  If I can

12   have you look at -- there's an email chain that is 2(g) and

13   then there's another email dated, June 4th, which is 2(f),

14   comes before (g).  So if you can look at General Counsel's 2(f)

15   and 2(g), and specifically, there appear to be two emails that

16   were sent on June 4th.

17          UNIDENTIFIED SPEAKER:  Sorry, Judge, I don't know how to

18   turn that off.

19          JUDGE ESPOSITO:  Okay.

20   Q    BY MR. CHILDERHOSE:  Can you identify what's -- it's

21   backwards, but can you identify what 2(g) is?

22   A    Yes.  2(g) is an email sent on June 18th of 2020 from Mr.

23   Pascucci to me.

24   Q    Okay.  And 2(g) is - its nine pages.  It's a nine-page

25   email chain and it's in reverse order chronologically, so if



1     you go to the last page of 2(g).

2     A     Okay.  This is the beginning of that same chain which

3     starts with a June 4th email from Mr. Pascucci to me.

4          MR. PASCUCCI:  Coul -- could I clarify, is that page 33 of

5     the GC's Exhibit 2 (indiscernible, simultaneous speech)?

6          MR. CHILDERHOSE:  It's 32 and 33, yes.

7          MR. PASCUCCI:  So it starts at 33 right?  The email chain

8     starts at 33?

9          MR. CHILDERHOSE:  Or it ends at 33.  It's in reverse

10    chronological order because it's an email chain.

11         MR. PASCUCCI:  Yeah, but -- in other words, the

12    communication started at 33 and then went, you know, from there

13    up to 30 whatever, or --

14         MR. CHILDERHOSE:  Correct.  And then, so it appears that

15    on page 32 of the General Counsel's Exhibit 2 we have the first

16    email that's dated June 4, at 4:47 p.m., Mr. Pascucci.

17    Q     BY MR. CHILDERHOSE:  Mr. Martin, is that correct, Mr.

18    Martin?

19    A     Yes.

20    Q     And was this email sent after the June 4th bargaining

21    session?

22    A     I believe it was, yes.

23    Q     Okay.  And then if I can have you look at General Counsel

24    Exhibit (f), which is two pages, and it starts at page 23 of

25    General Counsel's Exhibit 2.  This appears to be a second email

1    from Mr. Pascucci on June 4th, which was sent at 5:18 p.m.

2    A     I see it, yes.

3    Q     Is that correct?

4    A     That's right, yes.

5    Q     Okay.  And so what -- what were these emails about

6    generally -- just to help us understand how these emails speak

7    to themselves, but if you understand, what -- what -- what was

8    being communicated -- what was this communication about?

9    A     I took these to, essentially, mean that Mr. Pascucci's

10   synopsis, or follow-up, to that bargaining meeting in the form

11   of propro -- excuse me, proposed ground rules, as well as his

12   key takeaways in his view from that session.

13   Q     And if you go to -- let me just scroll up the email chain

14   in 2(g), which is hard to do on my small laptop here.

15         MR. PASCUCCI:  Judge, I think we could just stipulate to

16   all this, can't we?  I mean, they are -- they are all dated.

17   You know, I think we can stipulate that -- to all the emails

18   back and forth.

19         MR. CHILDERHOSE:  Okay, can I --

20         JUDGE ESPOSITO:  Well -- well, I -- I -- I understand

21   that.  But you know, Mr. Childerhose also has the opportunity

22   to ask questions regarding the emails of Mr. Martin, if --

23   if -- if -- if he wants to.

24         So but -- but -- but let me just take a minute to clarify.

25   Okay.  Who -- who is now representing Respondent, Mr. DiLorenzo

1    or Mr. Pascucci?

2         MR. PASCUCCI:  I apologize, Judge.  I think we are sort of

3    acting as cocounsel, maybe.

4         JUDGE ESPOSITO:  Okay, I need one.  One person, it can be

5    either one of you.  I don't care who it is, but I just need

6    one.  Okay?

7         MR. DILORENZO:  Your Honor, I'm not sure of the Board's

8    rules here.  I mean, I understand Mr. Martin is the key witness

9    for the Charging Party and the General Counsel.  He also

10   appears to be representing the Charging Party.  I mean, is Mr.

11   Pascucci allowed to represent the Employer, as well as be a

12   witness in the case under the Board's rules?

13        JUDGE ESPOSITO:  If -- if -- if the other parties have no

14   problem with that -- with that, it's, you know, it's

15   typically -- I mean, it's typically in my experience, in

16   bargaining cases such as this, where there are attorneys that

17   were also chief spokespersons for a party in negotiations, the

18   parties often agree, amongst themselves, that the attorney who

19   is representing the party in the Board proceeding will -- may

20   also testify, and then in the event that they testify, then

21   they are questioned by a different attorney.  But for the

22   remainder of the proceeding when they are not testifying, they

23   act as the attorney for the party in the Board proceeding.

24        So if Mr. Childerhose and Mr. Martin have no problem with

25   Mr. Pascucci's represent -- you know, being the attorney for



1    the Respondent in the proceeding, as well as testifying, and

2    Mr. DiLorenzo can question Mr. Pascucci in the event that he

3    testifies, that's fine.

4          MR. PASCUCCI:  Judge, I apologize.  I am used to being the

5    attorney in these cases, so I --

6          JUDGE ESPOSITO:  I completely understand, Mr. Pascucci.  I

7    am just saying that in my experience, when there is more than

8    one attorney who is speaking, you know, during testimony, it --

9    it gets very chaotic, especially in this Zoom format, so that's

10   why I'm asking you to, sort of, pick one person.

11         MR. DILORENZO:  So are you saying Your Honor, though --

12   that I could be the one person for Mr. Pascucci's testimony,

13   and he could handle the rest of the case?

14         JUDGE ESPOSITO:  I've -- I've -- I've had that happen in

15   cases before when -- when all parties agree, because you do

16   have these situations in Board hearings that deal with

17   bargaining where you have attorneys who also -- attorneys

18   representing the party in the case, who are -- were also

19   spokespersons for the particular party in the context of

20   collective bargaining negotiations.

21         So I -- I don't find it unreasonable, if everyone else

22   agrees, you know, to have that attorney both represent the

23   party in the Board case, and then testify with a different

24   attorney questioning them during their testimony.

25         MR. DILORENZO:  So I would ask if -- the attorney, if Your



1    Honor, if we could find out from the people involved here

2    whether there is any objection?

3         MR. CHILDERHOSE:  None.

4         JUDGE ESPOSITO:  Okay.  Mr. Childerhose, Mr. Martin, do

5    you have an -- an objection with Mr. Pascucci repre -- sort of

6    serving as the lead attorney here for the Respondent on --

7    during periods of time when he is not testifying?

8         MR. CHILDERHOSE:  I have no objection to that.

9         THE WITNESS:  No objection, Your Honor, from the Union.

10        MR. DILORENZO:  Are you ready, do you want to talk alone,

11   or do you want to make a decision on this now?

12        MR. PASCUCCI:  It's up to you, Lou, either way.

13        JUDGE ESPOSITO:  Do you want -- I can put you in a

14   breakout room --

15        MR. DILORENZO:  Could you just give us two seconds?

16        MR. PASCUCCI:  Yeah, just give us two seconds.

17        JUDGE ESPOSITO:  Okay.  Let's go off the record for this.

18   (Off the record at 10:35 a.m.)

19        JUDGE ESPOSITO:  Okay.  Let's go back on the record.

20        THE COURT REPORTER:  Here we are.

21        JUDGE ESPOSITO:  Mr. Childerhose, go ahead.

22        MR. CHILDERHOSE:  Okay.  So I have General Counsel's

23   Exhibit 2(f), which is the 6/4/20 email, and I have General

24   Counsel's Exhibit 2(g), which is an email chain which starts on

25   June 4, 2020 and goes to June 18, 2020.  I would move for the



1    admission of 2(f) and 2(g).

2         JUDGE ESPOSITO:  Any objection to the admission of General

3    Counsel Exhibit 2(f) and 2(g)?

4         MR. PASCUCCI:  No objection.

5         JUDGE ESPOSITO:  Okay.  General Counsel Exhibit 2(f) and

6    2(g) are admitted.

7    **(General Counsel Exhibit Numbers 2(f)and 2(g) Received into**

8    **Evidence)**

9                        <u>**RESUMED DIRECT EXAMINATION**</u>

10   Q    BY MR. CHILDERHOSE:  Okay.  I'll have you look at General

11   Counsel's Exhibit 2(h).

12   A    Okay.

13   Q    Do you recognize this Exhibit?

14   A    I do.  This is bargaining notes from the June 25th, 2020,

15   session.

16   Q    And do these notes accurately reflect what occurred at

17   that session?

18   A    They do.

19   Q    And who prepared these notes?

20   A    Ms. Sanchez.

21   Q    Okay.  I'll have you look at General Counsel's Exhibit

22   2(i).  And do you recognize that Exhibit?

23        THE COURT REPORTER:  Just pulling it up, one moment.

24   A    I do, yes.  This is the counterproposal that Mr. Pascucci

25   provided on behalf of the Employer.



1    Q    BY MR. CHILDERHOSE:  When did you -- when were you -- when

2    did you receive that counterproposal?

3    A    I believe that was June 25th of 2020.

4    Q    Okay.  And was that before or after the bargaining

5    session, during the bargaining session?

6    A    As I recall, it was afterwards.

7         MR. CHILDERHOSE:  I move for the admission of GC 2(i).

8         JUDGE ESPOSITO:  Any objection to the admission of General

9    Counsel Exhibit 2(i)?

10        MR. PASCUCCI:  No Judge, it's my document.  But I know

11   this is strange, but for voir dire, I just think Mr. Martin is

12   incorrect about when he received this, but I guess we can do

13   that in cross.  I don't know if that would be voir dire at this

14   point or not.

15        JUDGE ESPOSITO:  Why don't you deal with that on cross-

16   examination since it doesn't -- I don't believe it really goes

17   to authentication of the document.

18        MR. PASCUCCI:  Okay.  Thank you.

19        JUDGE ESPOSITO:  All right.

20        MR. PASCUCCI:  So no objection, then.

21        JUDGE ESPOSITO:  Okay, so General Counsel Exhibit 2(i) is

22   admitted.

23   **(General Counsel Exhibit Number 2(i) Received into Evidence)**

24        THE WITNESS:  If I might -- if I might clarify, Your

25   Honor.



1        JUDGE ESPOSITO:  Um-hum.

2        THE WITNESS:  Sorry, I thought you had said to Mr.

3   Childerhose, when did I review it?  I did receive it in

4   conjunction with that bargaining session.  I believe it may

5   have been like immediately beforehand.  I gave it my full

6   actual review after the meeting.

7   Q    BY MR. CHILDERHOSE:  Okay.  And okay, I'll have you look

8   at General Counsel's Exhibit 2(j).  Can you identify this

9   Exhibit?

10  A    Yes.  This is bargaining notes from the February 2, 2021,

11  session.

12  Q    Okay.  And was this the next session that took place after

13  the June 25th bargaining session?

14  A    It was, yes.

15  Q    Okay.  And between -- between June 25, 2020, and

16  February 2, 2021, did the parties have any -- any bargaining or

17  any meeting take place?

18  A    There was not.

19  Q    Okay.  Is there an explanation for that?

20  A    Yes.  This was really, in many senses in New York City,

21  the height of the pandemic.  It was wreaking havoc, not only

22  across the city, but particularly, across the hospitality

23  industry, both broadly and specifically, for this hotel.

24       It was a very tough time for this industry and the Union

25  was certainly focused on helping people who were in dire

ATTACHMENT A

1    position, and -- and at the same time the hotel was greatly

2    diminished in the business that I was doing, and it seemed

3    sensible to have this delay between sessions to let everyone

4    get back on their feet.

5    Q    Okay.  And have you reviewed the bargaining notes

6    reflected in General Counsel Exhibit 2(j)?

7    A    I have, yes.

8    Q    Okay.  And these accurately reflect what was -- what took

9    place at that bargaining session?

10   A    They do.

11   Q    Okay.  I'll have you look at General Counsel's Exhibit

12   2(k).  What is this document?

13        THE COURT REPORTER:  Bear with me for a moment, please.

14   Thank you.  K as in kangaroo, Mr. Childerhose?

15        MR. CHILDERHOSE:  Correct.

16   A    This is a letter that I sent to Mr. Pascucci on February

17   5th of 2021.

18        MR. CHILDERHOSE:  Okay, I would move for the admission of

19   General Counsel 2(k).

20        MR. PASCUCCI:  No objection.

21        JUDGE ESPOSITO:  Okay.  General -- General Counsel Exhibit

22   2(k) is admitted.  I'm sorry Mr. Pascucci, I'm afraid I cut you

23   off on the tape, did you have an objection to 2(k)?  I don't

24   believe you --

25        MR. PASCUCCI:  No -- no objection.



1          JUDGE ESPOSITO:  All right.  Thank you.

2      **(General Counsel Exhibit Number 2(k) Received into Evidence)**

3      Q    BY MR. CHILDERHOSE:  I'll have you look at General

4      Counsel's 2(l).  This appears to be an email chain from

5      February 25th to March 8, 2021; is that -- is that correct?

6      A    I'm just pulling it up.  Would you mind repeating those

7      dates?

8      Q    It's a two-page -- two-page document.  It looks the first

9      email is from Ms. Pascucci to you dated February 25, 2021, and

10     then the last email, which is on page 1, is an email from you

11     to Mr. Pascucci dated March 8, 2021.

12     A    Yes.  I see the document.

13     Q    I'd move the admission - and these are the emails between

14     you and Mr. Pascucci?

15     A    They are, yes.

16         MR. CHILDERHOSE:  Okay.  I would move admission of General

17     Counsel 2(l).

18         MR. PASCUCCI:  No objection, Judge.

19         JUDGE ESPOSITO:  General Counsel Exhibit 2(l) is admitted.

20     **(General Counsel Exhibit Number 2(l) Received into Evidence)**

21     Q    BY MR. CHILDERHOSE:  During this time were there -- were

22     you communicating just through email or were there telephone

23     conversations?  Were the parties communicating in any other

24     way?

25     A    No.  It was emails with attached letters at times and then



1    the telephone conversations, to my recollection, were limited

2    to the bargaining sessions.

3    Q    Okay.  I'll have you look at General Counsel's 2(m).  Can

4    you identify this document?

5    A    I apologize.  It can be tough to hear.  Is it N as in

6    Nancy or --

7    Q    I'm sorry, M as in Mike.

8    A    Certainly.  So it's March as Exhibit (m) is again

9    bargaining notes.  This time from a session that was held on

10   March 11th of 2021.

11   Q    Okay.  And have you -- have you reviewed these bargaining

12   notes?

13   A    I have, yes.

14   Q    Do these accurately reflect what was -- what occurred at

15   the meeting?

16   A    They do, yes.

17   Q    Okay.  I'll have you look at the next -- and this -- this

18   was the next bargaining session that was held.

19   A    That's right.

20   Q    Following the February -- February 2nd meeting?  Okay.

21   I'll have you look at General Counsel's Exhibit 2(n) and

22   also -- it appears -- and also 2(o).  It appears that 2(n) was

23   attached to 2(o).  We'll start with (n).  Will you identify

24   General Counsel's Exhibit 2(n)?

25   A    Yes.  (n) is a letter dated March 30th of 2021 that I sent



1    to Mr. Pascucci.

2    Q    Okay.  And if you can look at General Counsel's Exhibit

3    2(o).  Was -- was (n) -- was that attached to 2(o) to the March

4    30th, 2021, email in the email chain that is 2(o)?

5    A    Yes, that's right.  It was an attachment.

6         MR. CHILDERHOSE:  I'll move the admission of 2(n) and

7    2(o).

8         MR. PASCUCCI:  Judge, if I could have a second.  I think

9    it's confusing the way these are arranged.  I just want to make

10   sure that everything is here.  I'd leave it.

11        JUDGE ESPOSITO:  Okay.

12        MR. PASCUCCI:  Yeah, no objection to 2(o) and 2(n).

13   Q    BY MR. CHILDERHOSE:  Okay.  I'll have you look at General

14   Counsel's Exhibit 2(p).

15        JUDGE ESPOSITO:  Okay, hold on.

16        MR. CHILDERHOSE:  Sorry.

17        JUDGE ESPOSITO:  General Counsel Exhibit 2(n) and 2 (o)

18   are admitted.

19   **(General Counsel Exhibit Numbers 2(n) and 2(o) Received into**

20   **Evidence)**

21   Q    BY MR. CHILDERHOSE:  Okay.  Mr. Martin, can I have you

22   look at General Counsel's 2(p).

23   A    Okay.

24   Q    Can you identify this Exhibit?

25   A    Yes, again looking at bargaining notes here this time for



1    a bargaining session held April 21st, 2021.

2    Q    Okay.  And have you reviewed these notes and are these

3    notes --

4    A    I have, yes.

5    Q    And are these notes an accurate reflection of what was

6    said at the -- at the bargaining session?

7    A    Yes, they are.

8    Q    Okay.  And this was the party's sixth -- sixth meeting; is

9    that correct?

10   A    That's correct.

11   Q    Have the parties met since this bargaining session?

12   A    We have not.

13   Q    Okay.  Has the Employer ever provided a counterproposal to

14   the proposal that the Union provided at the beginning of

15   bargaining?

16       MR. PASCUCCI:  I object to the form of the question,

17   Judge, because I don't know if you need counters --

18       MR. CHILDERHOSE:  I'm sorry, you're right.  I'm sorry.

19   Q    BY MR. CHILDERHOSE:  Have you -- have you ever received a

20   comprehensive counterproposal from the Employer?

21   A    No.

22       MR. CHILDERHOSE:  Okay.  I have no further questions, Your

23   Honor.

24       MR. PASCUCCI:  Judge, before we start our cross, I'd like

25   to request a copy of an affidavit, if one was submitted to the

1    Board during its investigation, from Mr. Martin.

2         JUDGE ESPOSITO:  Right.  Mr. Childerhose, are there any

3    Jencks materials?

4         MR. CHILDERHOSE:  Yep, I will email a copy of that

5    affidavit to Mr. Pascucci and Mr. DiLorenzo.

6         MR. PASCUCCI:  Thank you, and then, Judge, could we have a

7    few moments to --

8         JUDGE ESPOSITO:  Of course.  How long would you like, Mr.

9    Pascucci?

10        MR. PASCUCCI:  Maybe 15 minutes?  We may not need all of

11   that time but would that be all right?

12        JUDGE ESPOSITO:  All right.  So let's go off the record

13   and come back at 10 after 11.

14        MR. PASCUCCI:  Thank you, Judge.  So does that mean we go

15   a breakout room?

16        JUDGE ESPOSITO:  If you would like, I can put you and Mr.

17   DiLorenzo --

18   (Off the record at 10:55 a.m.)

19        JUDGE ESPOSITO:  All right.  Let's go back on the record.

20        Mr. Pascucci, cross-examination.

21        MR. PASCUCCI:  Yes, thank you, Judge.

22                        **CROSS-EXAMINATION**

23   Q    BY MR. PASCUCCI:  Mr. Martin, I just want to start with

24   the background of the case.  Do you agree that there was an

25   initial election which the Region set aside and ordered a new



1    election because of objectionable conduct raised by the

2    Employer to the first election?

3         MR. CHILDERHOSE:  I object to the relevance, Your Honor,

4    it's also outside the scope of direct.

5         JUDGE ESPOSITO:  Overruled.  Go ahead.

6    A    Yes.

7    Q    BY MR. PASCUCCI:  Okay.  And so -- and then when the

8    second election was held, do you agree that the Employer filed

9    post-election objections to that one as well because some of

10   the arguments that the Employer made were from the -- dated

11   back to the first and some were new, do you recall that?

12   A    I do.

13   Q    Okay.  And then when the -- when those objections were

14   overruled by the Region, the Employer appealed to the National

15   Labor Relations Board in Washington, correct?

16   A    I don't recall if it was an appeal or a request for review

17   but functionally it's the same thing, yes.

18   Q    Yes, I agree with you.  I think it's the same.  But that's

19   what --- so okay.  So you remember that we -- in one way or

20   another, we sought review by the Board in Washington.  Okay.

21   And then -- and then the Employer engaged in a technical

22   refusal to bargain after the Board in Washington disagreed

23   without the objections which resulted in a Court of Appeals

24   proceeding before the District of Columbia Circuit.  Is that

25   your understanding of what happened?



1    A     It is.

2    Q     Okay.  And the Charging -- and all of that takes time:

3    correct Mr. Martin?

4    A     Excuse me.  Yes, that did happen.

5    Q     Okay.  And there was no allegation in the Charging Party,

6    either back after the mandate was issued, there was no charge

7    filed then, and there was no allegation in the charge that was

8    filed in the case before us, suggesting in any way that the

9    Employer had engaged in bad-faith bargaining by virtue of the

10   fact that it sought those appeals; was there?

11   A     No.

12   Q     Okay.  And you're not alleging that today, correct?

13   A     That's right.

14   Q     Okay.  With respect to the bargaining notes -- I think

15   this -- maybe goes without saying but I just want to ask you

16   whether or not the notes that the Union prepared, Ms. Sanchez,

17   and I think that first meeting was another person in your --

18   your office, those are not -- those are not in the nature of a

19   verbatim transcript, correct?

20   A     Not exactly verbatim, quite close, but not verbatim, no.

21   Q     Well, I mean some of these calls were, I think you said

22   one of the meetings was 90 minutes, and I think others were 20

23   minutes or 30 minutes, but clearly a lot more was said then

24   what we see in those notes, correct?

25   A     More words, but I believe the notes captured all of the

1    substance.

2    Q    I agree with you.  I -- I -- I think they do, too.  But I

3    just want -- I'm just asking you for your testimony about

4    whether or not you are representing that those notes are the

5    entirety of the conversation or whether they are just a summary

6    of the conversation.

7    A    Again, I don't believe it's a verbatim recording of it.  I

8    think it's quite close.

9    Q    Okay.  With respect to that to timing, with respect to the

10   gaps between meetings, I mean, and particularly the sort of --

11   I don't know if it a year -- or roughly a year -- during

12   that -- during that time, the Union had made a decision not to

13   engage in further bargaining during the height of the pandemic,

14   correct?

15   A    I believe you are referring to what I think was a several

16   month gap.  I don't think it was ever a year gap.  But yes, at

17   the height of the pandemic, the depths of the business

18   declined, I provided for a longer gap between sessions than

19   normal.

20   Q    Right.  And what I'm getting at is you're not accusing the

21   Employer of having ever refused to schedule a meeting when the

22   Union asked for one, are you?

23   A    No, I'm not.

24   Q    Okay.  And that during that lengthy hiatus, however long

25   it was, there was no -- there was no request by the Union

1    during that lengthy hiatus to recommence bargaining which the

2    Employer declined, was there?

3    A    That's correct.

4    Q    So when the Union did decide to reach out and resume

5    bargaining, then the Employer agreed and rescheduled the next

6    meeting shortly thereafter, correct?

7    A    That's accurate.

8    Q    Okay.  And then with respect to just the last question you

9    were asked on direct, about the parties not having met since

10   the session that happened, I think maybe it was in April, sorry

11   I don't have that date in front of me, but the Union has not

12   requested a meeting since then to resume contract negotiations,

13   has it?

14   A    It seemed fruitless at that point given -- given where we

15   were, so no.

16   Q    So right.  So the Employer still has not ever refused,

17   even up to the present, ever refused to meet upon request with

18   the Union to negotiate, has it?

19   A    That's correct.

20   Q    Let's see.  I'm trying to go back and forth in my computer

21   screen between -- just give me a second, please.  I want to,

22   Mr. Martin, I just want to scroll through the notes and

23   possibly ask you a few short questions about some of the

24   dialogue between the parties, so bear with me, please.

25         Let me ask you -- let me ask you this.  You understood the

1   Employer's position -- let me ask you this, Mr. Martin.   In

2   these negotiations, did the Union ever make a counterproposal

3   to the Employer's proposals?

4   A    The Union made its first proposal, it's complete proposal.

5   The Employer provided, I believe, it was six enumerated

6   counterproposals --

7   Q    Excuse me.  I'm sorry, Mr. Martin.  That's not the

8   question.  The question is, did the Union ever make a

9   counterproposal to any of the Employer's proposals?

10  A    The Union did not counter those six proposals, no.

11  Q    Okay.  The only party in this -- in these negotiations who

12  were ever countered to the other sides proposals was the

13  Employer, correct?

14  A    The Employer was the only party that provided any counter

15  in the form of those six enumerated items and only those six,

16  yes.

17  Q    And is it true that I repeatedly said that if we just get

18  a response to those six, we could move on to other issues?

19  A    No, that's not true.  You wanted an agreement.

20  Q    That's not true either.  I apologize.  I know where --

21  this isn't a debate.  But are you alleging -- it's not in the

22  notes.  Are you alleging that the Employer ever said that we

23  have to reach agreement on all of these issues before we move

24  to other issues?

25  A    I don't believe you insisted on agreement on all six, but



1    you made it very clear that we had to get through those issues,

2    before you would move on and expand.

3    Q    Are you -- are you testifying that the Employer ever said

4    that we have to reach agreement on all noneconomic items before

5    we can move to economic items?

6    A    I don't believe you used the word all, no.

7    Q    And isn't it true that -- I think you acknowledged, and I

8    think it's in the bargaining notes, that all the Employer said

9    was that in -- in -- in its experience, in my experience, that

10   it's more productive, and it's usually how parties do this, is

11   to focus on noneconomics before proceeding to economics?

12   A    You did say that, yes.

13   Q    Okay.  So the idea was let's see -- let's see what we can

14   get agreed to in the noneconomics, and maybe that will be

15   easier and we can get things accomplished and narrow our

16   differences before we go on to the tougher issues and/or the

17   economic issues.  Is that -- is that your understanding of what

18   we were -- I was saying during those negotiations?

19   A    My understanding of -- of your intent on those?

20   Q    No, what I was saying.  Not my intent.  What I actually

21   said to you?

22   A    I don't specifically recall you saying it like that, but

23   yes, I understood your goal to be that you wanted to get

24   through a subset first.

25   Q    Well, okay.  I think the notes will speak for themselves



1    and the correspondence.  But is it -- let's see, what's another

2    question?  Isn't it also true, Mr. Martin, that you

3    understood -- that you indicated, more than once, that you

4    acknowledged that parties often negotiate first contracts in

5    the manner that I was suggesting?

6    A    Not certain if I used often, but yes, I certainly

7    acknowledge that the parties do it that way at times.

8    Q    Okay.  And is also true that you said the Hotel Trades

9    Council does not do it that way, that you preferred it -- to

10   provide Employers with an entire contract at the outset of

11   negotiations, correct?

12   A    That's correct.

13   Q    And is true that in this case, and I assume in other cases

14   where the Hotel Trades Council has bargained a first contract,

15   that your -- the thrust of your position is that the newly

16   united employers has to accept and agree to the industry-wide

17   agreement?

18   A    I'm sorry, Ray.  I missed that last part -- would you

19   repeat?

20   Q    Yeah, sure.  So I know it was a long question so sorry

21   about that.  Is it true that the thrust of the Union's position

22   is that this Employer and any other newly united Employers

23   needs to accept and agree to the IWA, the industry-wide

24   agreement?

25   A    I don't really want to speak to other employers in other



1    negotiations.

2    Q     That's fine.  Let's limit it to this negotiation.

3    A     For this one, yes, certainly.  The thrust of my proposal,

4    which is in the first meeting, was that we were hoping the

5    Hotel would join on to this mature pattern agreement with the

6    certain changes that we had put into that memorandum.

7    Q     And is that why -- because the Union was taking the

8    position that most of the language in the contract was also set

9    by virtue of the industry-wide agreement, and therefore, should

10   be simply accepted by the Employer, that you did not want to

11   actually talk about any of the other -- any of the Employer's

12   proposals?

13   A     No, that's not accurate.

14   Q     Well, you never did talk about the Employer's proposals,

15   right?  In substance, you simply said you wouldn't respond, you

16   provided no counter, et cetera.

17   A     As I said many times in our meetings, I was not able to

18   respond to a six-point counterproposal when I had given you a

19   complete contract, and I needed a complete proposal in order to

20   fully analyze and -- and respond to that in a complete way.

21   Q     So you never did engage in any substantive discussion

22   about the Employer's proposals, correct?

23   A     No, that's not correct.  We talked through that.  I asked

24   you questions about them, and you explained them to me.

25   Q     Okay, that's fair.  You never gave -- but you never did

ATTACHMENT A

1    give any -- any kind of a counter or any kind of a response,

2    other than saying we have to make a complete contract proposal

3    at the outset of negotiations for an initial contract, correct?

4    A    That's right, yes.

5    Q    Okay.  And do you also recall that, you know, I pushed

6    back on the idea that you can't, it's not possible for you to

7    negotiate any of this -- these subjects without the context of

8    an entire contract proposal form the Employer by suggesting

9    that we should be able to talk about the preamble, and we

10   should be able to work -- and be able to talk about

11   nondiscrimination and some of these other items that when the

12   Employer counters and that you don't need context -- you don't

13   need to have context in the overall contract to be able to

14   negotiate over some of those topics?

15   A    Yes.  I believe you described your position on that

16   similarly, yes.

17   Q    Okay.  And do you also recall, and I think it's in the

18   correspondence in the notes, but do you also recall me making

19   the point that, in my experience, for what it's worth, and I

20   think I've shared a lot of first contracts that with respect to

21   some of the more difficult noneconomic issues that the parties

22   may butt heads over, that in my experience it was helpful to

23   clear away as many of the -- of the easier topics as possible,

24   and then when you get down to the sticking points that often we

25   open up the economics at that point, and that dealmaking

1    happens that sometimes a party who is previously unwilling to

2    make a concession on a noneconomic item, might be more willing

3    to do it in the context of trying to get to a contract and the

4    parties are down to the -- the tougher issues and putting up

5    economics.  Do you recall all of that sort of explanation?

6        MR. CHILDERHOSE:  Your Honor, I'm going to object.  It

7    just feels like Mr. Pascucci is testifying to his questions in

8    a way (audio interference) --

9        JUDGE ESPOSITO:  That was -- that was -- that was quite a

10   lengthy question, Mr. Pascucci.

11       MR. PASCUCCI:  I agree, Judge, but the witness, I think,

12   was about to answer before the objection.  I think, if we could

13   read it back, I think -- I think it's a coherent question.  It

14   may be -- it may cover a lot of territory.

15       MR. CHILDERHOSE:  But what -- can we -- can we limit this

16   to a specific bargaining session, or you know, it's very --

17       MR. PASCUCCI:  No, I'm asking these generally because

18   there weren't a lot of bargaining sessions, frankly, and we --

19   we talked about these same topics every time, except for the

20   first meeting which was introductory.  But so Judge, if I -- if

21   the witness says he can't understand that I guess that's one

22   thing, but I thought -- I thought he -- he was about to answer.

23       JUDGE ESPOSITO:  Okay, Mr. -- Mr. Martin, do you

24   understand the -- the question?

25       THE WITNESS:  I actually was -- what I was about to say,



1     was to request that you break up the question a little bit,

2     if -- if it's possible.

3     Q     BY MR. PASCUCCI:  Do you recall me explaining that, in my

4     experience with bargaining first contracts that, often there

5     were some difficult noneconomic items that would be left open

6     and then when the parties entered into the economic phase, they

7     would often make deals and trade things, and that's how you get

8     to a contract ultimately?

9     A     I recall you stating that, yes.

10    Q     So there was never -- so in other words, the Employer

11    never said we -- we have to settle all noneconomics first.  We

12    have to settle these six first; it was simply a desire to build

13    a contract going through it -- a subset of topics one at a

14    time.  Is that your understanding of what I was saying in

15    negotiations?

16    A     It's not really.  I was on top of that.  The fact that I

17    asked countless times for expanded and an additional proposal

18    and you refused to do that.

19    Q     Well, clearly the Union wanted to negotiate the way you

20    wanted to negotiate.  In other words, you -- you gave us an

21    industry-wide agreement, 109 pages, I think it is, with a

22    memorandum of understanding, another 13 pages, and you wanted

23    us to simply accept that, correct?

24    A     Of course, I'd like for you to accept my initial proposal.

25    Q     And -- and what I was saying was -- well, we need to --

1    first of all, that the -- that the Hotel, in this case, did not

2    agree to accept all of that, and that we might need to

3    negotiate our own contract, and that in order to build a

4    contract from nothing because it's an initial contract, we felt

5    it would be more productive to deal with a limited set of

6    issues at a time, and then move to the next set, right?

7    A    Well, you did say that, yes.

8    Q    Okay.  And you just didn't want to do it.  You -- you --

9    you never -- you never were willing to even provide any counter

10   to the Employer's counters, correct?

11   A    I was insistent on the Employer providing a proposal that

12   covered all mandatory topics, yes.

13   Q    And the -- and the Employer -- and you understood -- the

14   Employer never refused to -- never said that it would refuse to

15   negotiate over any mandatory subjects.  It was simply a

16   question of sequence and -- and -- and how -- how we would get

17   there, correct?

18   A    You never proposed it.  It was years long bargaining.

19   Q    Well, wait a minute.  Wait a minute.  It wasn't years'

20   long bargaining, excuse me.  But when you say it was years long

21   bargaining, we just established that the big hiatus was due to

22   the pandemic, and that was the Union's decision, and that all

23   other meetings were held in accordance with the Union's

24   request.  You know, we agreed to schedule things promptly, as

25   soon as the request.  At the end of each meeting, we set the

1   next date.  You're not contesting any of that, are you Mr.

2   Martin?

3   A    I am not, no.

4   Q    Okay.  So the bottom line is that, you know, in the

5   limited amount of bargaining that did happen here for the --

6   for the reasons we've discussed, the Union was simply unwilling

7   to provide any counter to the Employer's counters without -- in

8   other words, the Union made it a condition of bargaining that

9   it would not negotiate over any of the Employer's counters

10  unless, and until, the Employer countered on the whole 115

11  pages that the Union had proposed, correct?

12  A    I was insistent on a complete proposal covering all

13  mandatory topics.

14  Q    So in other words, you made it a condition of bargaining

15  that the Employer had to provide an entire contract proposal,

16  up front, before you would provide any counters, or entertain

17  any proposals that the Employer had made, correct?

18  A    I likely would have accepted, you know, something closer

19  to what we proposed, as long as (audio interference) --

20  Q    That's not the question what you likely would have done.

21  The question is what did you did do, which is you made a

22  condition of bargaining over the subjects that the Employer

23  countered on, that the Employer must counter on everything,

24  right?

25  A    I -- I requested, repeatedly, a complete proposal



1   including all mandatory topics, yes.

2   Q    And -- and essentially you declined to engage in any

3   further negotiations unless that happened, unless that

4   condition was satisfied, correct?

5   A    Correct.

6        MR. PASCUCCI:  Okay.  I don't think I have any other

7   questions, Judge, but I would like to have an opportunity to

8   confer with Mr. DiLorenzo briefly, off-line, before we close

9   the cross.

10       JUDGE ESPOSITO:  Okay.

11       MR. DILORENZO:  Just a few minutes, Judge.  We can do it

12   by phone if you want to stay here.  I can just call Ray.

13       JUDGE ESPOSITO:  Okay.  Is that all right, Mr. Pascucci?

14       MR. PASCUCCI:  Yeah, of course.  Absolutely.  I'll just

15   mute and turn off the video and then we'll talk separately.

16       JUDGE ESPOSITO:  Okay, turn -- yes.  Mute yourselves and

17   turn off your video.  Okay, great.

18       MR. PASCUCCI:  Good.

19       JUDGE ESPOSITO:  Thanks.

20   (Off the record at 11:33 a.m.)

21       JUDGE ESPOSITO:  Okay.  All right, Mr. Pascucci, anything

22   else?

23       MR. PASCUCCI:  Not at this time, Judge.

24       JUDGE ESPOSITO:  Mr. Childerhose, do you have any redirect

25   examination?



1        MR. CHILDERHOSE:  I do not, Your Honor.

2        JUDGE ESPOSITO:  Okay.  Thank you very much, Mr. Martin,

3    you are excused.

4        THE WITNESS:  Thank you.

5        MR. PASCUCCI:  Judge, I have a question about

6    housekeeping.  Did the GC offer GC-3 -- General Counsel -- did

7    the General Counsel offer GC-3 yet for admission into evidence?

8        JUDGE ESPOSITO:  The -- the IWA agreement?

9        MR. PASCUCCI:  Right.

10       JUDGE ESPOSITO:  I don't think so yet.  Have you had an

11   opportunity to review it, Mr. Pascucci?

12       MR. PASCUCCI:  Yes.

13       JUDGE ESPOSITO:  Okay.  Is it -- is that the version that

14   was provided to you in 2020?

15       MR. PASCUCCI:  Yes, Judge.

16       JUDGE ESPOSITO:  Okay.  All right.  So Mr. Childerhose,

17   are you offering the IWA agreement as General Counsel Exhibit

18   3?

19       MR. CHILDERHOSE:  I am, Your Honor.

20       JUDGE ESPOSITO:  Okay.  All right.  And Mr. Pascucci, do

21   you have an -- an objection?

22       MR. PASCUCCI:  No, Your Honor.

23       JUDGE ESPOSITO:  Okay.  So then General Counsel's Exhibit

24   3 is admitted.

25       **(General Counsel Exhibit Number 3 Received into Evidence)**



 1          MR. PASCUCCI:  Judge, I apologize for this.  I think I

 2     should ask Mr. Martin one more question if you would allow it.

 3          JUDGE ESPOSITO:  Okay.  I don't -- I don't dis -- Mr.

 4     Childerhose, do you have a problem with Mr. Martin answering

 5     another question?

 6          MR. CHILDERHOSE:  No, I don't object.

 7          MR. PASCUCCI:  Thank you.

 8          JUDGE ESPOSITO:  Okay.  All right.

 9          MR. PASCUCCI:  I believe, I'm not sure if this -- did we

10     mark our Exhibits, Respondent's Exhibits --

11          JUDGE ESPOSITO:  The only one that's marked at this point

12     is Respondent Exhibit 1, which is the notes of the negotiating

13     session that's already in evidence.

14          MR. PASCUCCI:  Okay, then I believe everything is, well

15     no, the Employer's notes though, that's not -- it was evidence.

16     It was stipulated to, but I guess.  So I believe that all the

17     other Respondent Exhibits that we submitted yesterday were

18     repeated in what the GC has introduced into evidence so the

19     only -- so the last one would be Employer's 1, well, the only

20     additional one, with Respondent's 1, which is the Employer's

21     bargaining notes.  Right?  I don't have it marked, so I just

22     want to confirm that that's what already recognizes as

23     Employer's -- Respondent's Exhibit 1?

24          JUDGE ESPOSITO:  Yeah, yeah -- I -- I -- I've already

25     admitted that into evidence.



1       MR. PASCUCCI:  Thank you.

2       **RESUMED CROSS-EXAMINATION**

3  Q   BY MR. PASCUCCI:  So Mr. Martin, did you have an

4  opportunity to review the Employer's bargaining notes in this

5  case which are set forth in Respondent's Exhibit 1?

6  A   I did.

7  Q   All right.  And I realize they are shorter, certainly than

8  the Union's notes, but did -- would -- did you find anything in

9  those notes that you believe was inaccurate?

10  A   I did not.

11      MR. PASCUCCI:  Okay.  That's all, Judge.

12      MR. DILORENZO:  Your Honor, could I just have one second

13  with Mr. Pascucci, one second?

14      MR. PASCUCCI:  Okay.  Are you going to call me?

15      JUDGE ESPOSITO:  All right, go ahead.

16      MR. DILORENZO:  Thank you, Judge, sorry.

17  (Off the record at 11:38 a.m.)

18      MR. PASCUCCI:  So Judge, that's the end of cross.  Thank

19  you for that.

20      JUDGE ESPOSITO:  Okay, so Mr. Childerhose, do you have any

21  additional redirect?

22      MR. CHILDERHOSE:  I do not.

23      JUDGE ESPOSITO:  Okay.  All right.  Thank you very much,

24  Mr. Martin, for -- for -- for answering those additional

25  questions.  Okay.



1          General Counsel, anything else for your case?

2          MR. CHILDERHOSE:  No further witnesses.  So we'll rest for

3     case-in-chief.

4          JUDGE ESPOSITO:  Okay.  Mr. DiLorenzo?  Mr. Pascucci?

5          MR. PASCUCCI:  Do you want me to do the opening, Lou, or

6     do you want to?  I guess I'm supposed to, right?  Cause I'm --

7          MR. DILORENZO:  Yeah, yeah.  Yeah.

8          JUDGE ESPOSITO:  It's -- it's -- it's -- it's up to you.

9     You -- you don't even have to do an opening if you don't --

10         MR. PASCUCCI:  No, no.

11         JUDGE ESPOSITO:  Go ahead if you want.

12         MR. DILORENZO:  You should do it, Ray.

13         MR. PASCUCCI:  All right.  It's going to -- I'll keep it

14    brief, Judge.

15         JUDGE ESPOSITO:  Okay.

16         MR. PASCUCCI:  So, you know, the General Counsel in his --

17    the counsel for the General Counsel in his opening statement

18    tried to paint a picture that the Employer had refused to

19    bargain for -- you know, prior to the onset of these

20    negotiations for a year or for longer.  That was not -- none of

21    that was accurate.  The -- as Mr. Martin acknowledged on cross,

22    those were all legitimate procedural appeals that the Employer

23    made, and as now is on the record, there was a first election

24    that was set aside.  There were questions about the second

25    election, et cetera.  So the idea that years have gone by or if



1    the Board -- if the G.C. intends to cite cases in its brief

2    saying, well, where things have dragged out and the Employer's

3    been slow and tried to delay -- none of that -- that -- those

4    cases would be applicable to what happened here.  There was no

5    bad faith -- delay, bad faith, refusal to bargain, et cetera.

6    So the parties did bargain, when the bargained, you know, and

7    as Mr. Martin also acknowledged, the Employer always, you know,

8    readily agreed to schedule a meeting upon whenever the Union

9    requests one for negotiations, and so we proceeded at -- at a

10   pace that really the Union set, which was fine.

11        But when the parties bargained, basically the difference

12   between the two respective positions boiled down to that Mr.

13   Martin wanted to negotiate this contract the way he wanted to

14   negotiate it or the way the Hotel Trades Council wanted to

15   negotiate it, which was give the Employer an entire contract,

16   which was their boilerplate contract with a few -- a few

17   specific terms and an MOU, memorandum of understanding, and

18   basically the Employer had to accept that.  And if you read the

19   notes, especially from the first meeting, you know, I -- I said

20   are you telling us that, you know, we just have to accept this

21   and acquiesce to the Union's position that -- that -- that

22   there's no back and forth, there's no willingness on the

23   Union's part to acknowledge that this is a -- this is a new

24   contract.  It's a separate contract but only will be between

25   the Union and this hotel and that this is a small -- it's a

1    single hotel.  It's a standalone.  It's not part of a large

2    chain.  It's not a large hotel.  It's in Brooklyn.  It's not in

3    Manhattan, et cetera.  That you're telling us we're not going

4    to -- you're not going to be willing to negotiate the CBA just

5    for this property?  And the answer is absolutely not.  And the

6    answer is absolutely not.  The Union would not agree to that.

7    So the Union basically took the position that its -- its

8    massive, you know, 108-page, 100-year-old contract, industry-

9    wide contract, was a take-it-or-leave-it proposition and that

10   when the Employer attempted to bargain over discrete subjects

11   to try to build a contract in a way that, frankly I believe,

12   Judge, almost every -- at least in my experience, and I've been

13   doing this a very long time -- almost -- and -- and I believe

14   it's true that, across all of the labor relations community,

15   that this is how you negotiate.  You typically start with

16   noneconomics, you work through as many as you can, you try to

17   get tentative agreements.  The Union wouldn't -- wouldn't even

18   accept a ground rule that says we're going to have written

19   signed tentative agreements.  And you try to go issue by issue,

20   and eventually you cover all the issues.  And eventually you

21   have a contract.  So what we were trying to do wasn't novel, it

22   wasn't unique, it wasn't -- it was simply what is always done,

23   in my experience, unless the Union has taken the position that

24   we're going to -- you know, we're going to not really bargain a

25   separate a separate CBA for you, that we're going to take this

1    existing master agreement and essentially shove it down your

2    throat, and we didn't want to -- we didn't want to acquiesce to

3    that.  And I think we had a right to negotiate our own

4    collective bargaining agreement and negotiate it in a way that

5    is traditional and done almost universally across the labor

6    relations community for 85 years or the history of the National

7    Labor Relations Act and that the Union -- and then, again, I

8    make the point which I did on cross and Mr. Martin

9    acknowledged, the only party in these negotiations who ever

10   failed to provide any counter to the other side's proposals was

11   the Union, not the Employer.  We countered at least on those

12   six and wanted to have a dialogue about those six before we

13   moved to other issues.

14        So I think there's a legal question here, Judge.  And the

15   legal question is, you know, is it bad faith to try to

16   negotiate in the manner that-- that I -- that the Employer in

17   this case tried to negotiate?  Which is to try to build a

18   contract working through, you know, a -- a series of issues

19   at -- at a time before moving onto another set, not necessarily

20   to the point of an agreement but at least to have a dialogue

21   and maybe resolve some of them.  Or is it -- or is the Union

22   entitled to demand at the outset of negotiations for an initial

23   contract that the Employer must provide counters on every topic

24   including -- on every topic in the contract, including

25   economics.  And -- and the other part -- to me that's a legal

ATTACHMENT A

1    issue.  The other part -- and I don't -- I don't know if there

2    are cases on that, Judge.  I know I didn't -- couldn't find

3    any.  Mr. Martin said he'd send some to me, but he didn't.  I

4    don't know if there are cases on that.  I know there are cases

5    about other things that the General Counsel will argue apply,

6    but I don't think they do.  So anyway, we'll address all that

7    in our -- in our brief of course.

8        I think that's all.  I'm trying to think of anything else.

9    I think I made all my points, Judge.  Sorry for the lack of

10   a -- maybe well -- well-crafted opening statement, but that's

11   our opening.

12       JUDGE ESPOSITO:  Okay.  And so would you like to call a

13   witness, Mr. Pascucci, Mr. DiLorenzo?

14       MR. PASCUCCI:  Judge, I'm going to have Mr. DiLorenzo call

15   myself as a witness.

16       JUDGE ESPOSITO:  Okay.  All right.

17   Whereupon,

18                        **RAYMOND PASCUCCI, ESQ**

19   having been duly sworn, was called as a witness herein and was

20   examined and testified, telephonically as follows:

21       JUDGE ESPOSITO:  Let me just remind you about a few

22   things.  Listen carefully to each question before answering.

23   Do not start speaking or answering until you're sure the

24   question is finished so that there's not overlap on the tape

25   for the transcriber to deal with.  If someone objects, do not

1  answer the question.  Stop and wait for a ruling.  Let us know

2  right away if you're having trouble with your audio or video.

3  Interrupt whatever else is going on, and tell us if you're

4  having problems or waive your hand in front of the camera.  If

5  you do lose your audio and video completely, check your power

6  and internet connections and reconnect or reboot if necessary,

7  then try to join the hearing using the same link and numbers

8  you were sent next (sic) week.

9           THE WITNESS:  Understood, Judge.  Thank you.

10          JUDGE ESPOSITO:  Okay.  Go ahead, Mr. DiLorenzo.

11                      **DIRECT EXAMINATION**

12  Q    BY MR. DILORENZO:  Thank you, Your Honor.  Mr. Pascucci,

13  can you give us your name, your full name, and your title?

14  A    Yep.  Raymond J. Pascucci.  I'm a member of Bond,

15  Schoeneck -- the law firm of Bond, Schoeneck & King, PLLC, and

16  I was the labor counsel in this case for the Employer.

17  Q    And as labor counsel --

18          JUDGE ESPOSITO:  I'm -- I'm -- I'm sorry, let me just

19  interrupt you, Mr. DiLorenzo, because I realized I didn't ask

20  Mr. Pascucci to spell his name for the record, which -- which

21  is usually helpful.  Can you just do that, Mr. Pascucci?

22          THE WITNESS:  Absolutely.  Yes, it's P-A-S-C-U-C-C-I.

23          JUDGE ESPOSITO:  Okay.  Thank you.  Go ahead, Mr.

24  DiLorenzo.

25  Q    BY MR. DILORENZO:  Mr. Pascucci, how long have you been



1    employed at Bond, Schoeneck & King, the law firm?

2    A    I joined Bond, Schoeneck, & King in February of 1987.

3    Prior to that I was with Morgan, Lewis & Bockius, another law

4    firm, from 1985 to 1987.

5    Q    And your educational background?

6    A    My law -- I went to both undergraduate and law school at

7    Cornell.

8    Q    And how long have you specialized in labor relations?

9    A    The entire time, so 30 -- almost 37 years, I believe it

10   is, at this point.

11   Q    Any experience as a professor teaching labor relations?

12   A    Yes.  I cotaught a course for four or five years at the

13   Maxwell School of Government at Syracuse University, a -- a

14   course on collective bargaining.  And we were talking to --

15   that is -- that school is a very renowned school, and our --

16   our students were, for example -- we had a mayor from a city in

17   Japan, we had a lot of international folks who were officials,

18   mostly public sector, I guess all probably public sector,

19   governmental officials from other countries as well as from the

20   United States, who -- who wanted to learn about collective

21   bargaining and how it works here.

22   Q    And how many years have you -- I'm sorry.  You -- you said

23   that you were the labor attorney in this case for the Employer.

24   What role did you serve, if any, in the negotiations with the

25   charging party in this case?



1    A    I was the chief spokesperson for all of the negotiations.

2    Q    And you attended all the bargaining meetings?

3    A    I did.

4    Q    You -- roughly how many years have you been negotiate --

5    how many years have you served as chief spokesperson for labor

6    negotiations, different Employers?

7    A    Sorry.  I think my -- I turned that back on so you and I

8    could call each other -- now it's off.

9         JUDGE ESPOSITO:  Okay.  Thank you.

10        THE WITNESS:  Yeah.  I think that my -- the first time --

11   I started practicing law in 1985.  I second chaired on a couple

12   of negotiations almost immediately in the fall of '85.  I think

13   my first negotiation that I did on my own was in '89, and since

14   that time I've done -- I know I've done over 200 collective

15   bargaining agreements.  I do about five to eight -- I've done

16   about five to eight CBAs per year.  This year, I'm doing more

17   like 10 or 11 for the -- for the whole time.

18   Q    BY MR. DILORENZO:  And have any of those been first

19   contracts?

20   A    At least two dozen.  I could try to -- I was trying to

21   name them in my head, and I got up to about 24 or 5 first

22   contracts in multiple industries that I've done.

23   Q    Is there anything significant about a first contract

24   versus --

25   A    Absolutely.



ATTACHMENT A

1    Q     -- a renewal of an existing contract?

2    A     Yes.  Anybody who has practiced labor law knows that

3    there's a world of difference between an initial labor

4    agreement and a successor agreement.  The negotiations for

5    successor contracts are a lot simpler.  It's not always easy to

6    agree because sometimes the parties have economic --

7    disagreements usually over economic issues in successor

8    negotiations.  But in successor negotiations, the entire CBA,

9    all of the language from A to Z has already been agreed to and

10   there may be some proposed modifications, but they're generally

11   very minor.  And mostly the focus is on what are the wages

12   going to be for the next three years or the next however long

13   the term of the new agreement will be and/or maybe some benefit

14   issues.

15       But in a first contract, the parties start with a blank

16   piece of paper.  All of the language which is going to be the

17   foundation for the relationship, probably for decades or for,

18   you know, eternity, needs to be worked out.  And so you -- and

19   so my experience in first contracts is it's a much more com --

20   you know, more difficult process.  It takes longer.  It's

21   harder because you're developing this template.  And

22   oftentimes, you know, the Union has its own template,

23   boilerplate.  Let's say that it wants the employer to simply

24   accept, and if the employer does, that's fine.  I've actually

25   done a couple of first contracts where we settled it in a day

ATTACHMENT A

1    or two because the employer was willing to do it in those

2    cases.  But if the employer wants to negotiate its own

3    collective bargaining agreement, which it has a right to do,

4    that involves a -- a lot of work by both sides to craft a

5    document that ultimately is going to be the CBA and the basis,

6    not just for the first CBA, but all CBAs thereafter.

7    Q    Did you -- there -- there's been testimony from Mr. Martin

8    concerning the proposal that was given to you before the first

9    bargaining session.  Do you remember that?

10   A    Yes.

11   Q    He was asked on direct examination if the Employer

12   presented any counter proposal to that document that was sent

13   to you.  Was -- was it a matter of hours before the meeting

14   started?

15   A    I don't even -- I don't remember exactly.  I think it was

16   pretty much right when the meeting started.  But as Mr. Martin

17   subsequently testified, that first meeting was introductory in

18   nature.  When we received their proposals, which were as, you

19   know, very lengthy and you know, was a lot to absorb, I said to

20   Mr. Martin in that first negotiation, we're going to need some

21   time to -- to review this, and he said, of course, of course.

22   I understand.  And nobody -- there was no expectation, I don't

23   believe.  I don't think it would be normal, nor do I think Mr.

24   Martin, you know, had an expectation that we would give

25   counters that very first day after just seeing their proposal,

1   so we -- both sides said let's schedule another meeting, and

2   then we scheduled another meeting.

3   Q    Did you -- after that first meeting, did you consider the

4   industry-wide agreement, the IWA, that was given to you

5   together with the rider?

6   A    Absolutely, I for -- first of all, I forwarded it to Marc,

7   principal that was the owner of the business, and you know, he

8   reviewed it, and I reviewed it, and we talked about it.  And

9   you know, as I pointed out to Mr. Martin in the counters that I

10  gave him at the next meeting -- that I gave the Union at the

11  next meeting, some of the language, even though we only covered

12  the six -- we were starting out with what we thought made

13  sense.  We started out with a set of proposals that we thought

14  could lead to early tentative agreements and give us some

15  momentum in going forward from there, et cetera.  But I pointed

16  out to Mr. Martin that some of the language that was in our

17  counters was out of his document, and it -- and I remember

18  specifically at one point him saying, well, I don't recognize

19  this.  And then he looked at his own proposal, and he -- and he

20  found the sentence that we had put in our proposal and oh, I

21  see it's there.  And I said yeah, it's there with a lot of

22  other things that we didn't put in ours.  So -- but yes.  We

23  did consider those, and we -- and the intention -- what we did

24  in that first set of counters and what our intention was to do

25  with respect to all the other subjects covered by that



1   proposal, was to -- to agree to whatever we could agree to out

2   of their document while trying to also maintain a separate

3   collective bargaining agreement that we thought would make

4   sense for a small, single hotel in Brooklyn versus, you know,

5   an entire industry which is driven primarily, frankly, by very

6   large hotels in Manhattan.

7   Q    Did you explain to Mr. Martin at any time during any of

8   these negotiating sessions after you considered the IWA as to

9   why you didn't think it was applicable to your particular

10  Employer?

11  A    Yeah, I mean that's -- we talked about that a lot, and

12  what we were saying was that, you know, first of all the

13  economics in Brooklyn are completely different, and -- and

14  this -- some of this we're -- when I say the economics, we're

15  kind talking about pre-pandemic, because the pandemic was

16  devastating for everybody.  But pre-pandemic and for as far

17  back as anyone, I think, can remember, the -- the economics are

18  very different for a Brooklyn-based hotel versus a Manhattan-

19  based hotel.  And you know, in terms of room rates, you know,

20  we talked about the fact that the average room rate, I think,

21  in Brooklyn was, at the time, pre-pandemic, was maybe in the

22  mid-100s.  The average room rate in Manhattan was over 400.

23  But the occupancy rates in Manhattan were ver -- in those days,

24  pre-pandemic, were a lot higher than they were in Brooklyn.

25  But the labor market was different.  Frankly, the workers who



ATTACHMENT A

1    want to work in a Brooklyn hotel generally don't want to

2    commute into Manhattan.  They -- they -- they work there for a

3    reason, because they live there, and it's convenient.  And so

4    the -- it's -- so there's a world of difference between,

5    especially large, you know, 4 or 500, 600, and bigger, hotel --

6    room hotels in Manhattan, and our little hotel, I think -- and

7    I forget now, frankly.  I should have looked this up before

8    today, but I think there's maybe 60 hotel -- 60 rooms in this

9    hotel.  It's a small hotel.  And it operates under the

10   Brooklyn -- and I want to explain this too, -- which we talked

11   about a little bit in bargaining.  It's called a Brook -- it's

12   branded as a Brooklyn Fairfield Inn Hotel.  I mean, I'm sorry,

13   Brooklyn.  It's a Marriott -- Fairfield Inn by Marriott Hotel.

14   That's the brand, but it's -- but this is an independent hotel

15   which is operating under that brand through a license where

16   they agree certain standards.  But it's really a -- a -- its

17   own entity, and it's not -- Marriott hasn't -- the

18   International Marriott Company really has nothing to do with it

19   other than allowing the brand.  But so we talked about all of

20   that and said that this industry-wide agreement was written for

21   these very large hotels and with massive staffs and resources,

22   and you know, all -- and all the Union kept saying, in that

23   first meeting in particular was, you know, you think you're

24   special.  You're not special.  You have to agree to it too.

25   We've got other small hotels who agreed to it.  It works for

1   everybody.  You may not think it does, but it works for

2   everybody, so you have to agree to it.  And -- and so what we

3   tried to do in response to that was say, no, we don't want to

4   agree to all this.  Here's a set of proposals, and let's --

5   let's work through these and try to build a contract.

6   Q    Did you -- did you ever indicate that until agreement was

7   reached -- I -- were there six items that you countered?

8   A    I think so.

9   Q    Did you ever indicate during bargaining that until an

10  agreement was reached on those six items you would not move any

11  further with respect to negotiating any mandatory subjects of

12  bargaining?

13  A    Absolutely not.  In fact, I -- I said to Mr. Martin,

14  you're the ones who are putting conditions on -- setting up

15  roadblocks and putting conditions on bargaining, not the

16  Employer, in these -- in this case.  All we've said is,

17  here's -- here's some counters.  Let's get a response to those

18  counters.  I told him that, you know, we -- we would go to

19  another set, whether we settled these or not.  Let's get a

20  response.  We'll move on.  The Union just wouldn't respond to

21  anything, and the Union's stance was, you're going to accept

22  the -- the boilerplate -- the whole master agreement.  I

23  explained, and I think Mr. Martin acknowledged some of this on

24  cross-examination, that in my experience parties would often

25  work through the easier issues first, get TAs on those, then

1   move on to other issues that, in the end, oftentimes the

2   biggest sticking points on the noneconomics side would still be

3   open.  Then you'd get into the economics, and you'd start to

4   make deals and trade things off, and that's how you build a --

5   in my experience, for what it's worth, that's how you do a

6   first contract.  That's how you build a contract.  You know,

7   and I understand that the Hotel Trades Council would rather not

8   do it that way because they have the master agreement, and they

9   want everybody to accept the master agreement.

10  Q    Did you ever -- did you ever indicate that you would

11  refuse to negotiate economic items until all noneconomic items

12  were completed?

13  A    I did not.  In fact, what I was just saying was the

14  opposite of that.  It was that I acknowledged -- I recognized,

15  and I -- I said I would expect that in the end we'll be

16  wresting with economics alongside some of the remaining open

17  noneconomic issues.

18  Q    Did you ever receive any counterproposals to the six items

19  that you submitted to the Union?

20  A    Never.

21  Q    Did they ever explain to you why they were unwilling to

22  agree to those --

23  A    The only expla --

24  Q    -- or why they had no counterproposals to yours?  Did they

25  indicate, you know, we can't agree to number 3, Ray, because it

1    doesn't include X, Y, Z.  Did they give you any explanation for

2    the refusal to provide a counterproposal or refusal to agree to

3    any of your proposals?

4    A    I don't believe there was a substantive discussion about

5    what our proposal said or didn't say.  The -- the explanation

6    which was repeated multiple times was -- as Mr. Martin

7    testified earlier, was we can't respond to any of these until

8    we've seen the whole thing, the whole counterproposal and the

9    whole contract, because otherwise it's out of context.  And

10   what Mr. Martin said several times was, how do I explain to my

11   bargaining committee mem -- my bargaining unit members what our

12   position should be on something like nondiscrimination without

13   knowing what the pay rates are going to be?  And that, you

14   know, that's what they cared about primarily, I believe Mr.

15   Martin said at one point.  But his basic explanation was we

16   need to see everything before we can respond to anything.

17   That's never -- that -- you know, I -- I heard him say that

18   more than once.  I didn't agree with it because I -- and I

19   didn't believe it, because I know that it's -- in my experience

20   I've never had that argument made.  It's -- again, it's the way

21   contracts are negotiated, in my experience, first contracts at

22   least.  And you know, the bargaining committee members usually

23   understand that you -- that you work through issues one by one,

24   and you don't, you know, you don't have to have an entire

25   contract in front of you to under a discrete issue.



ATTACHMENT A

1    Q     Was the non -- let's talk about that nondiscrimination

2    proposal.  Did that pretty much mirror the legal obligations of

3    the Employer with respect to nondiscrimination?

4    A     Absolutely.  The difference between the Union's version of

5    that and our version was ours was a paragraph, and theirs was,

6    I think, at least a full page if not multiple pages.  And you

7    know, and -- and ours captured the law, I believe, in its

8    entirely, and -- and it should've been -- in my opinion, it

9    should've been noncontroversial, but -- but it was simpler.

10   And one of the things that we had said to the Union in the

11   first meeting, I believe, or maybe in the second meeting was

12   that, you know, one of our goals -- one of the Employer's goals

13   in these negotiations was to end up with a -- a simple document

14   that everyone can understand and read, not legalese, that it's

15   plain English, that it's straightforward, and so our -- you

16   know, our counters that we did submit to the Union for

17   consideration, were of that nature.  They were -- they were

18   short and to the point.  They -- and obviously, we were -- that

19   wasn't a final proposal on our part by any stretch, it was an

20   opening proposal, so we would negotiate over adding things and

21   modifying things but that the goal overall was to try to

22   simplify.  And the Union's document is anything but simple.

23   Q     There was -- Mr. Martin was asked some questions by the

24   General Counsel, and some of the emails that were referenced in

25   his testimony deal with ground rules.  You proposed some ground

1   rules.  Is that typical in negotiations for first contract?

2   A    Yeah, I -- I think it is, and any -- and often in

3   successor negotiations as well, it's very common.  Probably

4   more often than not, the parties will start by discussing some

5   ground rules, and usually, it's readily -- they're readily

6   agreed to, and usually, if it's a successor negotiation, you

7   just use the one from last time and maybe update the dates or

8   whatever.  But the ground rules that we proposed here were very

9   basic.  I mean, that we would have tentative agreements, you

10  know, and that we would focus on noneconomics initially.  I

11  understood that -- and I wasn't wedded to those particular

12  ground rules.  I understood that Mr. Martin had a different

13  view of things and -- but he did, in fairness to the Union,

14  here, in that return email where he put in red what the Union

15  would -- would be willing to agree to in ground rules and not,

16  at least we got, you know, we had some negotiation over that.

17  And parties didn't sign off on anything and didn't actually

18  agree to anything, but there was an engagement over those

19  proposed ground rules.  That was the -- after that there was

20  never any engagement over any of our counterproposals.

21  Q    Did -- did you -- you did reach an agreement, I think on

22  no recording?

23  A    Well we both -- maybe -- yeah, we had -- yeah, we had

24  verbal agreement.  What I'm used to is we -- once we agree on

25  the ground rules, we both initial and date it.  We didn't get



1    to that juncture.  But there were some of the things that were

2    in my ground rules that Mr. Martin said were agreeable to the

3    Union and some things that were not, and no recording was one

4    of those, yes, that were -- that we agreed to.

5    Q    And you -- you agreed with the testimony that Mr. Martin

6    gave concerning the fact that this is pretty much, there hasn't

7    been a meeting since April, but none has been requested?

8    A    I believe he agreed -- I believe he acknowledged that that

9    was the case, yes.  That -- that we -- we're ready to meet upon

10   request.  The fact that the charge was filed and is pending

11   does not suspend the Employer's obligation to bargain.  If

12   the -- and we're willing to, and we've never refused.  I

13   understand that if the -- if the parties think it makes sense

14   to wait, that's fine too.  You know but we -- but we never

15   declined a bargain.  And there has been no request since then,

16   since the --

17   Q    Have you -- have you indicated in any way, shape or form

18   to the Union -- have you communicated to the Union that any

19   bargaining now would be futile --

20   A    Huh-uh.

21   Q    -- futile because of the charge or any activity that's

22   gone on?

23   A    No.  In fact, I think that in the last session that we

24   had, I said, so -- I said to Mr. Martin, so you don't want to

25   schedule another meeting?  And Mr. Martin said no.  I believe



1    that's how that last meeting ended.

2        MR. DILORENZO:  No more questions.

3        JUDGE ESPOSITO:  Okay.  Mr. -- Mr. Childerhose, any cross-

4    examination?

5        MR. CHILDERHOSE:  Can I consult with Mr. Martin, Your

6    Honor?  Can I get a breakout room before I do cross-

7    examination?

8        JUDGE ESPOSITO:  Sure.  I'll put you in a breakout room.

9        Why -- why is this not --

10       I don't -- I don't understand why the breakout room thing

11   is only showing Mr. Pascucci.  Does anybody know what to --

12       THE COURT REPORTER:  I think he's probably still in there,

13   so he needs to actually log out of it.  That's probably why.

14       MR. PASCUCCI:  I left that room when I came to the main

15   room.

16       JUDGE ESPOSITO:  Yeah.  Yeah.  No, I -- let's -- let's go

17   off the record.

18   (Off the record at 12:06 p.m.)

19       JUDGE ESPOSITO:  Okay.

20       Mr. Childerhose, cross-examination?

21       MR. CHILDERHOSE:  Yep.  Just a few questions, Your Honor.

22       JUDGE ESPOSITO:  Sure.

23                          **CROSS-EXAMINATION**

24   Q    BY MR. CHILDERHOSE:  Mr. Pascucci, there've been a total

25   six sessions since the certification of the Union as the

1    employee's representative.  Is that correct?

2    A    I believe so.

3    Q    And the Employer off -- at some point offered a

4    counterproposal that had six items in it?  Is that correct?

5    A    I believe so.  Yes.

6    Q    Okay.  And these six items, do you remember what they

7    were?

8    A    No.  I'd have to look at the document, actually.  And I

9    don't have the document open right now, so if you want to show

10    me that, I -- it's -- whatever is in response to Exhibit 1.  I

11    know we had nondiscrimination.  I think we had preamble.  We

12    may have had recognition.  I forget what the others were.

13    Q    Okay.  And these -- these six items were chosen by the

14    Employer, weren't they?

15    A    Yes.  And as I explained to the Union, we thought that

16    maybe, you know, that these would -- might be a good place to

17    start.

18    Q    Okay, and -- and Union did not agree to these six items

19    being the six items to start with, did they?

20    A    Well, as I testified, the Union really didn't engage over

21    any of it.  They just said they needed to see an entire

22    contract proposal.

23    Q    Okay.  The Union wanted to discuss -- wanted proposals on

24    economics.  Didn't they?

25    A    They wanted proposals on everything.  They wanted us to



1    accept the IWA, which had all the language in it, and then they

2    wanted to have proposals on the economics, which would be

3    primarily, I think, what the MOU addressed.

4    Q    And -- and the -- the Employer never provided any

5    proposals on economics, did they?

6    A    We did not.

7    Q    And the six items that the Employer wanted to discuss,

8    those -- those six items never changed.  They were consistently

9    the six items chosen by the Employer throughout those six

10   sessions, correct?

11   A    Well, it -- I believe it was at the second session we gave

12   them a set of counterproposals which covered the six items, and

13   then the Union wanted proposals on everything, and as I

14   explained, we said that we thought it made more sense to get a

15   response at least to these before moving to other issues, but

16   we never got a response, so we never moved to other issues.

17   Q    You -- you talked about your history of bargaining with

18   other similar -- or on behalf of other employers with --

19   with -- with other unions, maybe in -- maybe this unions as

20   well, have you -- is this typically the approach you've taken

21   in bargaining?

22   A    Absolutely.  It's not only the approach I've taken it's

23   the -- I've never seen a different approach, frankly, for a

24   first contract by anybody, whether it was me as lead person or

25   me having knowledge about negotiations that other -- that

ATTACHMENT A

1    another attorney has handled or -- or that the client

2    themselves have handled.  I've never heard -- it's always been

3    done in this matter.  This is my experience.  Again, I can only

4    speak for myself on this, but.

5    Q    You've had unions agree to bargain on a subset of items --

6    to begin bargaining previously?

7    A    Yeah.  That's how -- what happens is typically -- first of

8    all, it's not typical --

9    Q    Okay.  All right, that's -- that -- that was my question.

10   That was it.

11   A    What was the question?  I'm sorry.  Could you repeat it?

12   Q    In bargaining, you've had unions that have agreed to

13   bargain on a subset of items after discussing those items

14   with -- with the Employer to begin bargaining?

15   A    Yes.

16   Q    Okay.

17   A    Yeah.

18   Q    In this case, the Union did not agree to the six items

19   that the Employer unilaterally chose to begin bargaining, did

20   it?

21   A    No, they didn't agree to all six, nor did they counter on

22   an -- on all six, nor did they counter on any one of the six

23   and -- and you know, I invited them to repeatedly.  And I tried

24   to open up a dialogue about the -- a couple of them, like the

25   nondiscrimination.  Why can't we work on that?  Why can't we

1    work on preamble?  I don't understand why this -- why we

2    shouldn't be able to discuss those without regard to an overall

3    contract proposal, and there was never any willingness on the

4    part of the Union to do that.

5    Q    To -- to clarify, the -- the Union did not agree that they

6    wanted to limit bargaining to these six noneconomic items.

7    A    I wasn't -- I wasn't attempting to limit bargaining to

8    those six.  I was just trying to start a process.  And those

9    were -- I thought, were some good places to start.  If the

10   Union had said to me, well let's start with these other three

11   items, these other five items, that would have been fine.  But

12   they never -- all it ever was, was agree to the IWA and give us

13   an entire contract proposal.

14   Q    The Union did request proposals on economic items, didn't

15   it?

16   A    Not -- no, not separate from an overall.  The Union, all

17   the Union ever requested was a contract proposal on everything,

18   both all noneconomics as well as all economics at the outset of

19   negotiations for an initial contract, which I've never seen

20   before.  Or heard of.

21       MR. CHILDERHOSE:  Okay.  Okay.  Your -- Your Honor, I

22   don't have any further questions.

23       JUDGE ESPOSITO:  Okay.

24       Mr. Martin, do you have any questions, for Mr. Pascucci?

25       MR. MARTIN:  I do not, Your Honor.



1          JUDGE ESPOSITO:  Okay.

2          Mr. DiLorenzo, do you have any redirect examination?

3          MR. DILORENZO:  Just a couple, Your Honor.

4          JUDGE ESPOSITO:  Sure.

5                          **REDIRECT EXAMINATION**

6     Q    BY MR. DILORENZO:  You were asked on cross-examination

7     about the fact that the Union has -- you've had unions agree to

8     this process.  For a first contract, have you actually had

9     unions propose easy topics to start the negotiations to build a

10    first contract such as preamble, recognition clause, what

11    applies to those kinds of things?  Have you had the union start

12    with (audio interference) contract?

13    A    Absolutely.  In fact, in the majority of the first

14    contract progressions and negotiations that I've handled, the

15    union starts with a series of noneconomic proposals, not the

16    entirety, but they pick four or five or whatever, and they

17    start with those, and then we counter to that, and then the

18    parties move forward on that basis.  That's how most of mine

19    have been.  Sometimes the Employer, you know, starts, like we

20    did in this negotiation, with some issues that we thought might

21    make sense to -- to try to -- try to bargain over it before we

22    move on to others, but -- or you know, at least have some kind

23    of dialogue with respect to those and then move on to others.

24    But yeah, so it's been probably more often than not it's the

25    union who has led with that approach, in my experience.



1    Q    Recog -- just so I understand it, Ray, you're -- the

2    recognition clause proposal was who was going to be covered by

3    this contract, correct?

4    A    Yes.

5    Q    Which has a relationship back to who was in the election

6    and what unit was certified by the Board?

7    A    My recognition proposal tracks exactly with the board

8    certification in terms of defining the bargaining unit.

9    Q    And did you ever hear what was objectionable about the

10   recognition clause that you proposed?

11   A    The Union just wouldn't discuss anything.  They did --

12   never -- never addressed it one way or the other.

13   Q    Now, you were asked on cross-examination that in this

14   particular case the Union did not agree to negotiate in this

15   matter, correct?

16   A    Correct.

17   Q    (Audio interference) with you selecting, perhaps, some

18   low-hanging fruit to get some agreement or discussion going.

19   They did not agree to that process, correct?

20   A    They did not.  And the Union basically put a condition on

21   bargaining that we couldn't proceed until they had an overall

22   contract proposal.

23   Q    And did you -- did you as the Employer refuse to agree to

24   negotiate from the IW contract as an entire proposal?

25   A    No, what we said -- we said we weren't willing to sign on

1   to that document, that we wanted to create our own document.

2   But in terms of some of the content of that document, as I

3   mentioned, the proposals we did present to the Union

4   incorporated some of the language from the Union's IWA.

5        MR. DILORENZO:  And -- no -- no more questions.

6        JUDGE ESPOSITO:  Okay.  Any additional cross-examination,

7   Mr. Childerhose?

8                    **RECROSS-EXAMINATION**

9   Q    BY MR. CHILDERHOSE:  Maybe just a point I missed.  With

10  regard to the bargaining notes we have on the record, you've --

11  you've reviewed those bargaining notes?

12  A    Yes.

13  Q    Both the Unions' and the Employers'?

14  A    Yes.

15  Q    And were there any inaccuracies in those bargaining notes

16  that you're -- you're aware of?

17  A    I didn't see anything that was wrong.  I don't think

18  that -- obviously they're not the entirety of the conversation,

19  but I think -- I didn't see anything that was incorrect.  And I

20  think that they -- they're a pretty good summary of what the

21  conversation was.

22       MR. CHILDERHOSE:  Okay.  No further questions, Your Honor.

23       JUDGE ESPOSITO:  Mr. Martin, do you have any cross-

24  examination at this point?

25       MR. MARTIN:  I do not.



1          JUDGE ESPOSITO:  And -- okay, Mr. DiLorenzo, any redirect?

2          MR. DILORENZO:  No, Your Honor.

3          JUDGE ESPOSITO:  Okay.  All right.  Thank you very much,

4     Mr. Pascucci.

5          THE WITNESS:  Thank you.

6          JUDGE ESPOSITO:  Mr. DiLorenzo, anything else for

7     respond -- or Mr. DiLorenzo, Mr. Pascucci, anything else for

8     respondent's case?

9          MR. PASCUCCI:  Just to introduce -- I don't know if we

10    introduced, or maybe it was already in evidence, the

11    Respondent's 1.  I believe you said it was, Judge, already in

12    evidence.

13         JUDGE ESPOSITO:  Yes.  Respondent's 1 is the notes.

14         MR. PASCUCCI:  Right.  And our propo -- our proposal's

15    in -- in your document, right?

16         JUDGE ESPOSITO:  Yes.  Your -- your -- your proposals

17    are -- are a General Counsel Exhibit.

18         MR. PASCUCCI:  Okay.

19         JUDGE ESPOSITO:  Or -- or -- I don't want to say that.  I

20    want to say there's a -- there's a set of proposals that

21    General Counsel and Mr. Martin identified as respondent's

22    proposals that --

23         MR. PASCUCCI:  It's -- yeah.  And -- and I saw those, and

24    those are -- my on -- the disadvantage here, of course, for all

25    of us, is we don't have the papers, so it's not easy for me to

1    see what's what.  But yeah, those -- those were our proposals

2    that were --

3          JUDGE ESPOSITO:  Okay.

4          MR. PASCUCCI:  -- included on our counsel's exhibit.

5          So I don't believe we have anything further, unless you

6    do, Lou.

7          MR. DILORENZO:  No, I don't think so.  I think -- I think

8    we're -- we rest.

9          JUDGE ESPOSITO:  Okay.

10         And General Counsel, you don't have -- do you have any

11   rebuttal?  You don't have any rebuttal, do you?

12         MR. CHILDERHOSE:  I don't anticipate it.  I --

13         JUDGE ESPOSITO:  Well, this is it.

14         MR. CHILDERHOSE:  Yeah, no, I --

15         JUDGE ESPOSITO:  It's now or never.

16         MR. CHILDERHOSE:  No, I -- I do not.  Before we close the

17   hearing, I -- I would like to check -- touch base with the

18   region, if I can do that.

19         JUDGE ESPOSITO:  Okay.

20         MR. CHILDERHOSE:  Just take a short break, so I can do

21   that.

22         JUDGE ESPOSITO:  Okay, so we'll -- we'll -- we'll take a

23   break for -- we'll take a break for that.  Before we do that, I

24   realized that I forgot to ask Mr. Pascucci to confirm on the

25   record that he's completely deleted any Jencks materials



1    received in connection with Mr. Martin's testimony from his

2    equipment and has destroyed any -- any materials that he may

3    have printed out in order to prepare for Mr. Martin's cross-

4    examination.

5         MR. PASCUCCI:  I will do that now, Judge.  I did not

6    print, so I will delete the email attachments that were sent to

7    me.

8         JUDGE ESPOSITO:  Okay, yes, please --

9         MR. DILORENZO:  And I will as well, Your Honor.

10        JUDGE ESPOSITO:  Yes, Mr. DiLorenzo.

11        MR. DILORENZO:  I didn't print it -- I didn't print it

12   either.

13        JUDGE ESPOSITO:  Okay.  So please -- please delete it

14   completely from your computer, including from the little

15   recycle thingy -- thing.

16        MR. PASCUCCI:  Right.

17        JUDGE ESPOSITO:  Yeah, right.  Thank you.

18        Okay, so Mr. Childerhose, how long do you need to consult

19   with the region before we close the record?

20        MR. CHILDERHOSE:  About ten minutes, Your Honor?

21        JUDGE ESPOSITO:  All right, so why -- everybody come back

22   at 12:30, okay?

23        Let's go off the record.

24        MR. CHILDERHOSE:  Thank you.

25   (Off the record at 12:22 p.m.)



1       JUDGE ESPOSITO:  Okay.  Mr. Childerhose, anything else?

2       MR. CHILDERHOSE:  Nothing further, Your Honor.

3       JUDGE ESPOSITO:  Okay.  I will prepare and file with the

4  Board my decision in this proceeding.  A copy will be served on

5  each of the parties.  You are reminded to refer to the Board's

6  rules and regulations for information regarding the filing of

7  briefs and proposed findings for my consideration and regarding

8  procedures before the Board after the issuance of the judge's

9  decision.  I will allow until September 7th, 2021 for the

10  filing of briefs and any proposed findings and conclusions.

11  Briefs should be filed directly with the judge's division

12  office in New York, New York, regardless of whether they are

13  e-filed or mailed.  See Sections 102.2 to 102.5 of the Board's

14  rules for filing and service requirements.  Any requests for an

15  extension of time for the filing of briefs must be made in

16  writing to Associate Chief Judge Kenneth Chu in that office and

17  served on the other parties.  The positions of the other

18  parties regarding the proposed extension should be obtained and

19  set forth in the request.  Request for extensions must contain

20  specific reasons and show that the requesting party cannot

21  reasonably meet the current deadline.

22      There being nothing further, the hearing is now closed.

23  Off the record.

24  **(Whereupon, the hearing in the above-entitled matter was closed**

25  **at 12:33 p.m.)**



ATTACHMENT A

1
<u>C E R T I F I C A T I O N</u>

2
This is to certify that the attached proceedings, via Zoom

3
videoconference, before the National Labor Relations Board

4
(NLRB), Region 29, Case Number 29-CA-275229, Troutbrook

5
Company, LLC d/b/a Brooklyn 181, Hospitality, LLC and New York

6
Hotel and Motel Trades Council, AFL-CIO, held at the National

7
Labor Relations Board, Region 29, Two Metro Tech Center, Suite

8
5100, Brooklyn, New York 11201, on August 3, 2021, at 9:30 a.m.

9
was held according to the record, and that this is the

10
original, complete, and true and accurate transcript that has

11
been compared to the reporting or recording, accomplished at

12
the hearing, that the exhibit files have been checked for

13
completeness and no exhibits received in evidence or in the

14
rejected exhibit files are missing.

15

16

17

18
_____

19
BARRINGTON MOXIE

Official Reporter

20

21

22

23

24

25



www.escribers.net | 800-257-0885

ATTACHMENT A